FILED
United States Court of Appeals
Tenth Circuit

August 8, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

APRIL J. RAMPTON,

      Defendant - Appellant.

No. 13-4116

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**[*]
**(D.C. No. 2:11-CR-00812-DB-1)**

---

Submitted on the briefs:

Kathryn Nester, Federal Public Defender (Daphne Oberg, Assistant Federal Public Defender, with her on the briefs), District of Utah, Salt Lake City, Utah, for Defendant - Appellant.

Kathryn Keneally, Assistant Attorney General (Frank P. Cihlar, Chief, Criminal Appeals & Tax Enforcement Policy Section; Gregory Victor Davis and Mark S. Determan, Tax Division, Department of Justice, with her on the brief), Washington, D.C., for Plaintiff - Appellee.

---

[*] After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

**HARTZ,** Circuit Judge.

Defendant April Rampton received a large tax-refund check from the IRS after she submitted false tax forms. She claims that the refund check was a government pronouncement that her actions were legal. After receiving her refund she helped others submit false tax returns using the same method. For her efforts she was convicted on nine counts of aiding and abetting the filing of false and fraudulent claims for income-tax refunds between January 15 and February 19, 2009. *See* 18 U.S.C. §§ 287 and 2. She asserts that the district court's refusal to instruct the jury on the defense of entrapment by estoppel deprived her of a fair trial. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the conviction. She was not entitled to an entrapment-by-estoppel instruction because it would have been unreasonable to infer the legality of her conduct from the payment of the refund.

## I.    BACKGROUND

When bonds and certain other debt instruments are issued at a discount to the value at maturity, the difference between the issue price and the redemption value is called "original issue discount" (OID). That difference in value can be said to arise from imputed interest on the original instrument, and the annual imputed interest is taxable income under federal law. *See* I.R.S. Publ'n 1212, Guide to Original Issue Discount

Instruments (rev. Dec. 2013). Financial institutions and businesses use IRS 1099

Original Issue Discount (1099-OID) forms to report that income. The form lists, among

other things, the entity that issued the investment (the payer), the investor (the recipient),

the amount of original issue discount for the year, any other interest on the investment,

any early-withdrawal penalty, and the amount of federal income tax withheld. The entity

that issued the investment sends one copy to the IRS, which maintains the information to

ensure compliance with tax laws, and sends another copy to the investor for use when

preparing tax returns. Although businesses ordinarily file the forms, in some

circumstances an individual might legitimately file a 1099-OID form as well.

The IRS checks tax returns to be sure that they are complete, mathematically

correct, and signed by the taxpayer (certifying that the information is true and correct).

According to trial testimony by an IRS agent, however, congressionally mandated time

limits for sending tax-refund checks to taxpayers limit the scope of review before a

refund is sent. In particular, the IRS does not check returns against the 1099-OID

information in its database before issuing refund checks.

In the spring of 2008 Defendant called the IRS and ordered forms. She received

by mail the 1099-OID forms, together with the required transmittal form and instructions,

although she testified that "I looked at the forms and they made a lot of sense, so I kind of

disregarded the instructions." R., Vol. 3, part 4 at 867.

Defendant's use of the forms was nonsensical. On each of three 1099-OID forms

she listed herself as the recipient; a financial institution to which she owed credit-card or

3

mortgage debt as the payer; the amount she owed the institution as the amount of original issue discount for 2007; and the same amount as the amount of federal income tax that had been withheld. Her entries thus listed real financial institutions and the actual amount she owed them (a total of $227,325), but they incorrectly identified that figure as the amount she had earned on OID investments, and they incorrectly stated that the institutions had withheld that amount of federal income tax on her behalf. She sent a certified copy to the IRS and a copy to each of the financial institutions.

Once she was confident the forms had been filed with the IRS, she filed an amended 2007 tax return for a refund of withheld taxes. On the return she reported that an additional $227,325 in taxes had been withheld on her behalf and that she had no taxable income, entitling her to an additional refund of $227,325. For the "Explanation of Changes" on the return she wrote: "I hadn't yet received my 1099 OID. This new amount is from the 1099-OID forms." *Id.*, Vol. 1 at 136. She signed it, certifying under penalty of perjury that the amended return was "true, correct, and complete," *id.* at 135, and put it in the mail. She testified that she signed the certification "because I truly believed this was legal." *Id.*, Vol. 3, part 4 at 873.

In August the IRS sent her a refund check for $228,967.28, the requested amount plus interest. She claims that "receipt of the check from the IRS validated her belief that the 1099-OID process was legal." Aplt. Br. at 3.

Defendant had learned of this scheme at a meeting with Winston Shrout (her stepfather), Ernest Jessop (her brother-in law), and an unidentified man called "Tony,"

4

who was promoting it as a legitimate method of debt relief. Tony was purportedly a wealthy real-estate investor who had successfully used the method on 50 or so homes in Texas. At the time of the meeting, Defendant was unemployed and living on disability income, was having trouble making ends meet, and had defaulted on her mortgage. She was not licensed to prepare tax returns, but she had taken college courses in business and accounting and had previously prepared tax returns for herself and family members.

Although Defendant had some initial questions about the legality of the process, Shrout assured her that it was "absolutely, 100 percent" legal. R., Vol. 3, part 4 at 863. She testified that at this point she believed "[t]hat it was a completely legal program, that this was something that the banks had been doing that they were profiting from and we were not, and that this was something that was going to allow the I.R.S. to actually make things right and stop the bank fraud." *Id.* at 864. She said that that she believed the 1099-OID scheme was "an answer to prayer" that would help her provide for her children, *id.* at 861, and that she "totally understood" it and it "made perfect sense" to her, *id.* at 860.

Defendant's explanation at trial, however, was incomprehensible. She testified to the following rationale for her entries on the 1099-OID forms:

> [W]hatever loans you had, anything that you had actually signed loan paperwork on, so car loans, mortgages, credit cards, that any of those—that the bank was able to take your loan paperwork and it became an asset and it became like cash to them. So this process was a way that we, as the person taking out the loan, would be able to have access to that money instead of the bank only having access to the money. . . . The I.R.S. is a tax collector for us . . . . [T]he I.R.S. would become the middleman between us, the

5

general public, and loan holders and the banks, and that they would be able to go to the banks and enforce this, so that they would have to actually pay us the money that they had been keeping from us.

*Id.* at 858–59. Her brother-in-law gave perhaps a fuller, although still incomprehensible, account of Tony's explanation of the theory behind the scheme:

[B]asically, through fractionalization the banks loan against the mortgages they receive, which is legal, but that they were selling off the notes and still keeping them on their ledger as an asset, and that the I.R.S. being the only ancillary people for the banks, or rather the only people that the banks are answerable to, that by filing this paperwork, it would force the bank to use a clause in commerce, if I remember correctly it was the equal consideration—in other words, they got caught with their hands in the cookie jar, and if the I.R.S. said where is the note, and when they can't produce it, their only recourse is to give the amount of the note [back to the debtor].

*Id.*, part 1 at 89.

Regardless of the incomprehensibility of the scheme, Defendant was emboldened by her success with her own taxes. She showed a copy of her refund check to friends and family members and convinced a number of them either to prepare their own returns or to allow her to prepare returns for them using the same process. She charged for her help. Several received large refund checks, including one for $249,000.

On January 8, 2009, an IRS agent met with one of the acquaintances Defendant had instructed on her 1099-OID method. The acquaintance had used the method to prepare a return for herself and others. The agent informed her that she had used the forms incorrectly and that she could be fined or imprisoned for her frivolous filing. She promptly called Defendant and told her what the agent had said. She testified that "I told

6

[Defendant] that I had met with the I.R.S. agent and he told me that what I had done was a frivolous filing, and that I needed to reverse it or there would be penalties and possibly jail." *Id.*, part 2 at 371. Defendant responded that she could continue and "that it sometimes was a scare tactic when they do that." *Id.* After this conversation Defendant helped file nine more returns, which were the bases of the counts on which she was convicted.

During an interview with the IRS in July 2009, Defendant admitted that $227,325 in taxes had not been withheld on her behalf, that she did not have that amount of income from OID investments, and that she had prepared (rather than received) the 1099-OID forms used to justify her amended return.

In September 2011 a grand jury in the United States District Court for the District of Utah indicted Defendant on one count of filing for a false income-tax refund for herself on July 29, 2008 (Count 1), and on 14 counts of making and presenting, or causing to be made and presented, false claims for income-tax refunds for others between September 30, 2008, and February 19, 2009. *See* 18 U.S.C. §§ 287 and 2. Before trial she moved to dismiss Counts 2 through 15 on the ground of entrapment by estoppel, asserting that "the IRS, a government agency, by issuing a valid check . . . to [Defendant] affirmatively told her that her conduct was legal." R, Vol. 1 at 57. Although the motion failed, during trial she proposed the following instruction:

> For you to return a verdict of not guilty based on the defense of entrapment
> by estoppel, the defendant must prove the following three factors by a

preponderance of the evidence:

1.       there [w]as an active misleading by a government agent;

2.       defendant actually relied upon the agent's representation, which was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation; and

3.       the government agent is one responsible for interpreting, administering, or enforcing the law defining the offense.

*Id.*, Vol. 2 at 165 (footnote and internal quotation marks omitted). *See United States v. Bader*, 678 F.3d 858, 886 (10th Cir. 2012). The district court refused to give the instruction because there was insufficient evidence "that any government official or agency announced that the charged criminal act was legal." *Id.*, Vol. 3, part 5 at 925. After a six-day trial, the jury did not reach a verdict on the first six counts (for Defendant's return and returns she prepared for others in October and November of 2008), but it convicted her on the remaining nine counts (for returns filed after January 15, 2009).

## II.    DISCUSSION

"A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in h[er] favor." *United States v. Harris*, 695 F.3d 1125, 1136 (10th Cir. 2012) (original brackets and internal quotation marks omitted). Although ordinarily "[w]e review the district court's refusal to issue a requested theory-of-defense instruction for an abuse of discretion," *id.*, the district court's ruling that there was insufficient evidence to justify an instruction on the defendant's

8

theory of defense is a legal conclusion that we review de novo, *see United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1164 (10th Cir. 1999).

Defendant contends that the district court's refusal to instruct the jury on an entrapment-by-estoppel defense deprived her of a fair trial. We disagree because she was not entitled to the instruction.

"A claim of entrapment by estoppel is at heart a due process challenge." *United States v. Hardridge*, 379 F.3d 1188, 1192 (10th Cir. 2004). To convict a person for "exercising a privilege which the State had clearly told him was available to him . . . would be to dispense with the basic requirement that citizens receive fair warning of what actions are criminal." *Id.* (citation and internal quotation marks omitted). To establish an entrapment-by-estoppel defense, a defendant must show (1) "an active misleading by a government agent . . . who is responsible for interpreting, administering, or enforcing the law defining the offense"; and (2) "actual reliance by the defendant, which is reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id.* (brackets, citation, and internal quotation marks omitted).

Of central importance in this case is the requirement that reliance be reasonable. After all, "[t]he general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991); *see United States v. Lain*, 640 F.3d 1134, 1139 (10th Cir. 2011) ("[T]he Supreme Court has made clear that ignorance of the law is no excuse."). And consistent enforcement of the law requires a reasonableness limitation on

the entrapment-by-estoppel exception to the general rule. As the Ninth Circuit wrote in a seminal opinion on the matter:

> When a defendant claims . . . that his criminal conduct was the result of reliance on misleading information furnished by the government, society's interest in the uniform enforcement of law requires at the very least that he be able to show that his reliance on the misleading information was reasonable—in the sense that a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.

*United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970). Absent the reasonableness requirement, "the more successfully a defendant presented himself as ill-educated or naive, the stronger would be his argument . . . ." *United States v. Rector*, 111 F.3d 503, 506 (7th Cir. 1997), *overruled on other grounds by United States v. Wilson*, 169 F.3d 418, 427 n.9 (7th Cir. 1999).

Moreover, and perhaps more importantly, due process is rooted in conceptions of fairness. And absent a statement by the government that would convince a reasonable person that her unlawful conduct is actually lawful, there is nothing unfair, certainly no unfairness that would rise to a due-process violation, in prosecuting her for the unlawful conduct.

The courts consistently hold that a defendant's reliance was unreasonable if the defendant obtained the government's inaccurate guidance by providing false information or omitting relevant information. For example, in *Gutierrez-Gonzalez* the defendant claimed as the basis of an entrapment-by-estoppel defense that he reasonably believed he was in the United States legally because the federal Immigration and Nationalization

10

Service had issued him a temporary work permit.  *See* 184 F.3d at 1168.  We held that his reliance on the "erroneous issuance" of the permit was unreasonable because he had "submitted a fraudulent application that affirmatively stated that he had never been deported."  *Id.* (emphasis omitted).  Other circuits have adopted essentially the same view.  *See United States v. Giffen*, 473 F.3d 30, 41–43 (2d Cir. 2006); *United States v. Treviño-Martinez*, 86 F.3d 65, 69–70 (5th Cir. 1996); *United States v. Triana*, 468 F.3d 308, 315–19 (6th Cir. 2006); *United States v. Baker*, 438 F.3d 749, 755–58 (7th Cir. 2006).

Here, Defendant states that she reasonably concluded that her conduct was lawful because the government sent her a refund based on the 1099-OID forms she prepared.  But the forms falsely reported that more than $200,000 had been withheld to cover her income taxes.  She admitted that this was a total lie.  If the information on the forms had been true, she could properly have claimed a credit (and likely a refund) based on that withholding.  Obviously the government took the OID forms as true, and no one could reasonably infer that the government's response implied that she was entitled to a refund even if the information reported on the OID forms was false.

Defendant asserts that her reliance was reasonable because "[t]here is simply no way a reasonable person could know the bureaucratic machinations of the IRS would allow it to issue checks even where agents see numerous obvious red flags in the tax documents," Aplt. Br. at 12 (internal quotation marks omitted), and because numerous "other witnesses similarly believed the check validated the 1099-OID filing," *id.*

11

Nonsense. "Garbage in, garbage out" is a commonsense observation familiar to all. No reasonable person would be deluded into thinking that payment of the refund reflected that the government had audited her forms for accuracy, had discovered her deceit, and yet still decided that she was due the refund. The delusions of Defendant's greedy associates do not make her reliance any more reasonable.

Finally, Defendant asserts that the district court's refusal to give the estoppel instruction "carried with it particular harm" because her estoppel defense "served as a corollary" to her good-faith defense under *Cheek*, 498 U.S. 192, "that she acted in good faith and believed her tax filings and assistance to be correct." Aplt. Br. at 15. This argument, however, is too poorly developed to deserve review by this court. At best she is saying that *Cheek* required an instruction similar to her proposed estoppel instruction. Yet she has made no argument that her instruction was required under any doctrine other than entrapment by estoppel. The additional arguments in her reply brief cannot save her. *See United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) ("We routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." (brackets and internal quotation marks omitted)).

## III.  CONCLUSION

We AFFIRM Defendant's conviction.

12