**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 4, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ELEDRIA J. BRADLEY,

Defendant - Appellant.

No. 14-3011
(D.C. No. 6:13-CR-10058-MLB-1)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

Eledria J. Bradley, a member of the Kansas Air National Guard, was convicted by

a jury of wire fraud:  she falsely claimed her "Home of Record" changed from Wichita,

Kansas, to her father's address in Chandler, Arizona.  The change, accepted as true by the

Air Force, resulted in her receiving higher housing benefits (Basic Allowance for

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished).  *Id.*

Housing) and benefits she would not have otherwise received (lodging and per diem) for approximately two years. The questions presented here are whether the district judge erred in refusing to give a proposed entrapment-by-estoppel instruction and whether the government presented sufficient evidence of her intent to defraud the United States. Because the proposed instruction misstated the law and was not supported by the evidence, it was properly refused. The evidence was sufficient. We affirm.

## I. BACKGROUND

Bradley lived in Arizona (presumably with her father) until she graduated from high school in 2002. She then moved to Wichita, Kansas, to reside with her grandparents. In 2004, she enlisted in the Kansas Air National Guard. Four years later, in November 2008, she married Gary Bradley, an active duty serviceman with the United States Air Force stationed at McConnell Air Force Base in Wichita. The two lived in an apartment in Wichita.

In February 2009, Bradley received orders (Title 32 orders) from the Kansas Air National Guard to report to her Security Forces squadron[1] at McConnell Air Force Base in Wichita for annual training from April 6-10, 2009. She also received orders from the United States Air Force (Title 10 orders)[2] to report to active duty on April 11, 2009, for a

---

[1] The Security Forces squadron provides law enforcement services to the military base to which it is assigned.

[2] "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States," "a reserve component of the national armed forces." *See Perpich v. Dep't of Def.*, 496 U.S. 334, 345, 347 n.19 (1990). When state guard members are called to active duty by the United
(Continued . . . )

- 2 -

one-year deployment to Saudi Arabia.  Her Title 10 orders required her to first report to

Fort Bliss, Texas, for desert training before leaving for Saudi Arabia.  At the time she

received her Title 10 and 32 orders, Bradley's military personnel file reflected her Home

of Record as the apartment she shared with her husband in Wichita.[3]

On April 10, 2009, while serving her Title 32 orders but aware of her Title 10

orders, Bradley accessed her military personnel file via a website called Virtual Military

Personnel Flight (VMPF)[4] and changed her Home of Record to her father's address in

Chandler, Arizona.[5]  In order to justify a guard member changing her Home of Record,

she must physically move her belongings to the new address; intent to move to a new

address in the future is not enough.  Although Bradley told investigators she had moved

_____

States, they lose their status as members of the State militia and serve the federal military. *Id.* at 346-47.  "At all other times, [however, they] serve solely as members of the State militia under the command of a state governor." *Clark v. United States*, 322 F.3d 1358, 1366 (Fed. Cir. 2003).  In this case, Bradley was under federal Title 10 orders when she received the benefits to which she was not entitled; the United States was defrauded, not the State of Kansas.

[3] Although this case involves a fraudulent change of address, the trial transcript provided for this appeal unexplainably redacts addresses throughout.  We were able to discern from context the addresses to which the witnesses were testifying but the redactions made our review more burdensome.

[4] In order to access VMPF, an individual needs a military identification card, a password and a pin number.  The server for VMPF is located at Randolph Air Force Base in San Antonio, Texas.  Thus, when Bradley changed her address on the system in Wichita, Kansas, it had to travel to Texas via the Internet, thus establishing the "use of interstate wire communications" element of the offense. *See United States v. Porter*, 745 F.3d 1035, 1051 (10th Cir. 2014).

[5] The government's brief says the change occurred on April 9, 2009.  But the evidence at trial showed that although Bradley changed her Home of Record on a computer program called My Pay on April 9, 2009, the change on VMPF occurred on April 10, 2009.

some of her belongings to a friend's house in Phoenix, Arizona, in February 2009, she did not list her friend's house as her Home of Record. Instead, she listed the address of her father, whose testimony was unequivocal: she had not moved any belongings to his residence and he did not recall her telling him she would be changing her Home of Record to his address. Bradley admitted to investigators she changed her Home of Record in order to obtain a higher Basic Allowance for Housing (BAH) while she was deployed. BAH is money guard members receive, in addition to their salary, to "help sustain their household[s] while they're on active duty orders." (R. Vol. 3 at 122.) The amount of BAH is based on the member's Home of Record. During the relevant time period (April 2009 to April 2011), the BAH for Chandler, Arizona, was greater than that for Wichita, Kansas.[6] By changing her Home of Record from Wichita to her father's address in Chandler, Bradley increased the amount of BAH she would receive while under Title 10 orders.

On April 11, 2009, Bradley reported to Fort Bliss for desert training as ordered. Soon thereafter, she was injured during a training exercise. Due to her injury, she was not deployed to Saudi Arabia but instead was required to return to McConnell Air Force Base in Wichita. She was placed on a "medical hold," which required her to stay in the

---

[6] At trial the government presented evidence that in 2009 through 2011, the BAH for a guard member ranked E3 without dependents for Wichita, Kansas, was $648, $669 and $663, respectively. The BAH for Phoenix, Arizona, the area applicable to Chandler, Arizona, was $909 in 2009 and 2010; $873 in 2011. As applied to Bradley, however, the numbers were somewhat distorted because her rank was E4, not E3—a mistake first recognized during trial.

Wichita area until a medical review board cleared her to leave. (R. Vol. 3 at 92, 228.) While on medical hold, Bradley continued to receive the increased BAH payments. She also began receiving lodging and per diem because her Home of Record—Chandler, Arizona—was outside the commuting distance for McConnell Air Force Base. Had her Home of Record remained Wichita, Kansas, she would not have been eligible for these additional benefits.

Upon her return to McConnell Air Force Base, Bradley was assigned a desk job in the Comptroller Unit (finance). In June 2009, Shellie Armstrong, the head of the Comptroller Unit and Bradley's supervisor, asked Bradley why her personnel file showed Chandler, Arizona, as her Home of Record. Bradley told her she had earlier moved her belongings to Arizona. Armstrong accepted Bradley's explanation.[7]

Bradley remained on a medical hold until April 23, 2011, when she was medically retired from the military. During the medical hold (April 2009 to April 2011), she continued to receive BAH payments based on her Home of Record being Chandler, Arizona. She also submitted monthly vouchers to the Comptroller Unit to be paid lodging and per diem. Those vouchers were reviewed, audited, and approved by multiple members of the Comptroller Unit. In the end, Bradley received over $6,000 more in BAH payments for the Chandler address than she would have received had her Home of

---

[7] Bradley may have only expressly told Armstrong that she moved belongings to Arizona, but the address given as her Home of Record in her personnel file was her father's home in Chandler. Armstrong could reasonably assume the move was to the listed address, not elsewhere. For that reason we refer to the Arizona move as a move to her father's house.

Record remained Wichita. She also received over $54,000 in lodging and per diem—benefits she would not have received had she not falsely claimed her father's Chandler, Arizona, address as her Home of Record.

In June 2012, the Air Force instigated an investigation. In speaking with the investigators, Bradley initially denied she was the one who changed her Home of Record but eventually admitted to doing so. She also gave conflicting information as to her proper Home of Record. She initially claimed her Home of Record should be Virginia because she had completed some military duty there and had left property there with an ex-boyfriend.[8] She continued with this story after being confronted with the fact she had since married a serviceman stationed at McConnell Air Force Base. She also claimed her Home of Record should be her father's address in Chandler, Arizona, because that is where she resided prior to joining the military and where she had intended to move after her deployment. She claimed to have told her father she was going to list his address as her Home of Record. She also told the investigators she had moved a trunk-load of property to a friend's house in Phoenix, Arizona, in February 2009. Finally, as stated previously, she admitted the reason she changed her Home of Record to her father's address was so she would receive a higher BAH while she was deployed.

Bradley was indicted with one count of wire fraud. The indictment alleged her changed Home of Record from Wichita to Chandler resulted in her "receiv[ing] *lodging*

---

[8] The trial testimony indicated Bradley had served at Langley Air Force Base in Virginia but the dates of her service were unclear. The PSR states she was stationed there from December 2007 to July 2008.

*and per diem benefits* to which she was not entitled, from approximately April 11, 2009, until April 23, 2011, in the approximate amount of $54,992.80." (R. Vol. 1 at 8 (emphasis added).) Notably, the indictment did not mention the increased BAH payments she also received as a result of the change. The jury was instructed accordingly: in addition to other elements,[9] it was required to find beyond a reasonable doubt that she "devised or intended to devise a scheme to obtain money by means of false or fraudulent presentences, or representations; that is, she falsely reported her address via . . . [V]MPF *in order to obtain lodging expenses and per diem from the United States.*" (R. Vol. 1 at 23 (emphasis added).) No mention was made of the BAH payments.

At the close of the evidence, Bradley requested a jury instruction on entrapment-by-estoppel and submitted a proposed instruction. The proposed instruction required Bradley to show, *inter alia*, "that an agent or agents of the government affirmatively assent[ed] or by their acquiescence" misled her. (R. Vol. 1 at 14.) The district judge denied the request because the proposed instruction misstated the law and "there's no evidence in the case that [Bradley] actually went to anyone in authority and presented this scenario, . . . I want to change my address to Arizona because I think even though I'm going to be deployed . . . I can get more BAH . . . and that the person said that's okay,

_____

[9] The jury was also required to find Bradley "acted with specific intent to obtain money by means of false or fraudulent pretenses, or representations," "used interstate wire communication facilities for the purpose of carrying out the scheme," and "the scheme employed false or fraudulent pretenses, or representations that were material." (R. Vol. 1 at 23.)

- 7 -

you can do that." (R. Vol. 3 at 301-02.) The jury found Bradley guilty. She was

sentenced to three years of probation.[10]

## II. DISCUSSION

A.      Entrapment-by-Estoppel Instruction

Bradley claims government agents misled her into believing the change of her

Home of Record was proper. After all, she says, her monthly vouchers for lodging and

per diem were continuously reviewed and approved by multiple employees of the

Comptroller Unit. Moreover, Armstrong knew her Home of Record was Chandler,

Arizona, yet did nothing to correct it.[11]

---

[10] This sentence was a downward variance from the guideline range of 12 to 18 months. We know the variance was based on the judge's consideration of the factors set forth in 18 U.S.C. § 3353(a). We do not know, however, the specific reasons for the variance because the sentencing transcript was not provided.

[11] Bradley violated a military regulation by changing her Home of Record while under orders. At trial, Armstrong erroneously testified that the pertinent military regulation did not go into effect until 2011. On re-direct examination (after a noon recess) she corrected herself, saying the regulation was in effect when Bradley changed her Home of Record in April 2009. Bradley attempts to capitalize on Armstrong's temporary memory lapse, arguing "[that] the person overseeing the very office in charge of such matters believed the regulation didn't go into effect until much later is evidence that shows the procedures followed by Ms. Bradley were not just allowed, but were the standard operating procedures . . . . As such, Ms. Bradley should have been allowed her theory of defense instruction of entrapment by estoppel." (Appellant's Op. Br. at 16.) Bradley reads too much into Armstrong's testimony. That Armstrong could not recall at trial, four years after the fact, the effective date of the regulation does not mean she or the Comptroller Unit waived the regulation at the time. In any event, assuming, *arguendo*, that the regulation was not followed in April 2009, a physical move of belongings was required in order to justify a change of address and the evidence clearly demonstrated Bradley's knowledge of the requirement. Bradley does not argue Armstrong actively misled her as to the physical move requirement—something Bradley did not satisfy when she changed her Home of Record.

"A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in her favor." *United States v. Rampton*, 762 F.3d 1152, 1156 (10th Cir. 2014). Ordinarily, we review for abuse of discretion a district court's refusal to give a requested theory-of-defense instruction. *Id.* However, where, as here, the district judge concludes there was insufficient evidence to justify the instruction, our review is de novo. *Id.*

"The defense of entrapment by estoppel is implicated where an agent of the government affirmatively misleads a party as to the state of the law and that party proceeds to act on the misrepresentation so that criminal prosecution of the actor implicates due process concerns under the Fifth and Fourteenth Amendments." *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994); *see also Rampton*, 762 F.3d at 1157 ("A claim of entrapment by estoppel is at heart a due process challenge. To convict a person for exercising a privilege which the State had clearly told him was available to him would be to dispense with the basic requirement that citizens receive fair warning of what actions are criminal.") (citation and quotations omitted). "To establish [the] defense, a defendant must show (1) an active misleading by a government agent who is responsible for interpreting, administering, or enforcing the law defining the offense; and (2) actual reliance by the defendant, which is reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Rampton*, 762 F.3d at 1157 (quotations omitted).

In this case, Bradley claims to have requested and proposed an entrapment-by-estoppel instruction. Not exactly. As defense counsel admitted to the district judge, the

proposed instruction modified the first element of the defense. While our case law requires an active misleading by the government agent, the proposed instruction merely required an "affirmative[] assent" or "acquiescence." (R. Vol. 1 at 14.) Bradley could not then, nor does she now, point to any case law supporting such modification and we have found none. For that reason alone, the district judge properly denied her proposed instruction. *See United States v. McKinney*, 822 F.2d 946, 949 (10th Cir. 1987) ("[R]equested instructions that are misstatements of the law . . . are correctly refused.").

Assuming, arguendo, she had proposed a proper instruction, the district judge correctly concluded there was insufficient evidence to support its submission to the jury. That is because the evidence did not establish either (1) an "active misleading" by a government agent or (2) reasonable reliance.

We have yet to define the exact contours of the "active misleading" element of the defense. But we do know that inaction alone is insufficient. *See United States v. Westover*, 107 F. App'x 840, 844 (10th Cir. 2004) (unpublished).[12] The Supreme Court cases from which the defense originated involved government agents explicitly misadvising defendants as to the law. *See Raley v. Ohio*, 360 U.S. 423, 437-39 (1959) (convictions for failure to answer questions of a state commission violated due process because chairman of commission informed defendants they could decline to answer by invoking their Fifth Amendment rights); *see also Cox v. Louisiana*, 379 U.S. 559, 570-71

---

[12] Unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). We mention *Westover* because of its persuasive and reasoned analysis.

(1965) (reversing conviction of a protestor for demonstrating "near" a courthouse because police had advised the protestor where he could demonstrate but then arrested him for demonstrating in that area).

This case does not come close to meeting the demanding elements of the asserted defense. *See United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1166 (10th Cir. 1999) ("We have held that the courts invoke the doctrine of estoppel against the government with great reluctance.") (quotations omitted). Neither Armstrong nor the employees of the Comptroller Unit explicitly informed Bradley she could change her Home of Record without a physical move of her belongings in order to receive increased benefits. There was no active misleading as to the law. Armstrong's conduct amounts to nothing more than inaction—she inquired about the Home of Record and accepted Bradley's explanation that she had moved her belongings to her father's home in Arizona.[13] Armstrong's misplaced trust hardly amounts to active misleading.

And there is another compelling reason why the evidence did not support an entrapment-by-estoppel instruction—any reliance by Bradley on the "approval" of her Home of Record by Armstrong or others in the Comptroller Unit was not reasonable. "[A] defendant's reliance [is] unreasonable if the defendant obtained the government's inaccurate guidance by providing false information or omitting relevant information." *Rampton*, 762 F.3d at 1157. For instance, in *Rampton*, the defendant claimed she reasonably believed her conduct concerning the filing of certain tax forms was lawful

---

[13] *See supra* n.7.

- 11 -

because the Internal Revenue Service sent her a refund check. *Id.* at 1158. We concluded such reliance was unreasonable because the forms she filed falsely reported certain income had been withheld. *Id.* "Obviously the government took the [tax] forms as true, and no one could reasonably infer that the government's response implied that she was entitled to a refund even if the information reported on the . . . forms was false." *Id.* Similarly, in *Gutierrez-Gonzalez*, the defendant argued a clerk with the Immigration and Nationalization Service affirmatively misled him into believing he was lawfully in the United States by issuing him a work authorization permit even though he told her he was in the country illegally. 184 F.3d at 1168. We concluded his reliance on the issuance of the work permit was unreasonable because it was based on his "fraudulent application that affirmatively stated that *he had never been deported*." *Id.* at 1168-69.

Here, any "approval" by Armstrong was based on Bradley falsely informing her that she had moved her belongings to her father's address in Chandler, Arizona. As Armstrong testified, she did not question Bradley further because "when [a guard member] tells me they're going to live somewhere, the core values of the Air Force are integrity first, service before self and excellence in all we do. I shouldn't have to question an E4's integrity."[14] (R. Vol. 3 at 214.) Likewise, the approval of her vouchers by various employees of the Comptroller Unit was based on the same false premise that her Home of Record was her father's address in Chandler, Arizona, as Bradley had

---

[14] Again, Bradley's rank was E4. *See supra* n.6.

reported.  Bradley cannot now claim she reasonably relied on the "approval" of these government agents when that "approval" was based on her lies.

B.      Sufficiency of the Evidence

"Whether the government presented sufficient evidence to support a conviction is a legal question we review de novo."  *United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007) (quotations omitted).  "[W]e view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict."  *United States v. Espinoza*, 338 F.3d 1140, 1146-47 (10th Cir. 2003).  "We will reverse the verdict only if no rational jury could have found [the] [d]efendant guilty beyond a reasonable doubt."  *Id.* at 1147.

"To convict a defendant of wire fraud under 18 U.S.C. § 1343, the government must show (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire communications to execute the scheme."  *United States v. Porter*, 745 F.3d 1035, 1051 (10th Cir. 2014).  Bradley focuses on the intent to defraud element of the indictment, viz., defrauding the United States of lodging and per diem by changing her Home of Record before her deployment.  But, as the argument goes, she could not have intended to receive those benefits at the time she changed her Home of Record on April 10, 2009.  That is because, at the critical time, she did not expect to receive those benefits because she was being deployed to Saudi Arabia.  She actually received those benefits

only after she was unexpectedly injured, returned to McConnell, and forced to stay there on a medical hold.[15]

This is superficially a thorny issue. Without doubt, the government presented sufficient evidence for the jury to conclude Bradley intended to defraud the United States of increased BAH payments. Indeed, the jury heard from one of the investigators who related Bradley's admission of having changed her Home of Record in order to obtain a higher BAH. Ordinarily, that would be enough to sustain her conviction because the type of property intended to be obtained by the fraud is not an element of wire fraud. *See* 18 U.S.C. § 1343 (referring simply to "money or property"); *see also Porter*, 745 F.3d at 1051.

But the indictment narrowed its scope by needlessly specifying the type of property obtained by the fraud—lodging and per diem. And the jury instructions specifically told the jury that to convict Bradley it had to find she "devised or intended to devise a scheme to obtain money by means of false or fraudulent presentences, or representations; that is, she falsely reported her address via . . . [V]MPF in order to *obtain lodging expenses and per diem* from the United States." (R. Vol. 1 at 23 (emphasis added)). Consequently, while the statute does not require proof of the type of property

_____

[15] Bradley challenged the sufficiency of the evidence as to her intent to defraud of lodging and per diem (as opposed to BAH) in the district court in her motion for judgment of acquittal. Although she did not raise a variance argument, the district judge first addressed the issue in that context, concluding that even if there was a variance between the indictment and the trial evidence, Bradley had not shown her substantial rights had been affected by it. He then decided the evidence was sufficient to support the jury's verdict.

- 14 -

intended to be obtained, both the indictment and the jury instructions did. "It is settled law in this circuit, as elsewhere, that the language employed by the government in its indictments becomes an essential and delimiting part of the charge itself, such that if an indictment charges particulars, the jury instructions and evidence introduced at trial must comport with those particulars." *United States v. Farr*, 536 F.3d 1174, 1181 (10th Cir. 2008) (collecting cases) (quotations omitted);[16] *but see United States v. Miller*, 471 U.S. 130, 136 (1985) ("A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored.") (quotations omitted). Thus, we consider whether there was sufficient evidence at trial to show Bradley intended to defraud the United States of lodging and per diem.

No evidence suggested an intent to defraud (as to lodging and per diem) on April 10, 2009, when she changed her Home of Record. As she argues, at that time she

---

[16] *Farr* is a constructive amendment case—the indictment charged Farr with evading payment of the quarterly employment tax but the evidence and jury instructions at trial allowed the jury to convict her for evading payment of the trust fund recovery penalty. 536 F.3d at 1181-84; *see also United States v. Alexander*, 447 F.3d 1290, 1297-98 (10th Cir. 2006) ("An indictment is constructively amended if the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment.") (quotations omitted). There was no constructive amendment of the indictment in this case—both the indictment and the jury instructions referred to lodging and per diem.

Nor does Bradley raise a variance argument on appeal. *See United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002) ("A variance arises when the evidence adduced at trial establishes facts different from those alleged in the indictment, and denigrates the Sixth Amendment right to be informed of the nature and cause of the accusation.") (quotations omitted). Thus she has waived it. *Garcia v. Lemaster*, 439 F.3d 1215, 1216 n.2 (10th Cir. 2006).

did not know she would be injured and required to return to Wichita rather than deploy with her unit to Saudi Arabia. Her return to Wichita triggered her receipt of lodging and per diem; she would not have received these benefits had she deployed to Saudi Arabia.[17] But that does not end the matter. The indictment charged her with a scheme to defraud "[b]eginning on or about April 10, 2009, and continuing until approximately April 23, 2011." (R. Vol. 1 at 8.) This temporal period permitted the jury to find Bradley had the intent to defraud the United States—initially by an increased BHA and later by obtaining improper lodging and per diem payments.

Armstrong correctly testified that a physical move of belongings was required in order to justify a guard member's change of her Home of Record. Bradley obviously knew this—she initially told one of the investigators that her Home of Record should be Virginia because she left property there with an ex-boyfriend and, when confronted by Armstrong regarding her Home of Record being Chandler, Bradley explained she had moved her belongings to Arizona. Moreover, Bradley worked (twice) in the Comptroller Unit which handles the payment of benefits.[18] Therefore, a permissible (and logical) inference is that she was aware of the requirements for changing her Home of Record.

_____

[17] There was no direct evidence at trial that Bradley would not have received lodging and per diem had she deployed to Saudi Arabia as planned. However, there was evidence that lodging and per diem are paid to guard members who are not provided housing at their respective base. A logical inference is that Bradley would have been provided housing while deployed in Saudi Arabia and thus would not have been paid these benefits. Bradley drew on this inference in her motion for judgment of acquittal.

[18] Bradley admitted to investigators that her work in the finance department "gave her a better understanding of the finance regulations regarding travel pay and pay of

(Continued . . . )

- 16 -

Similarly, Bradley knew her Home of Record affected the amount and type of benefits to which she would be entitled. She had worked in the Comptroller's Unit, but, more importantly, she admitted to changing her Home of Record in order to receive an increased BAH while deployed. A reasonable jury could infer Bradley also knew her later receipt of the lodging and per diem benefits was based on her Home of Record being Chandler. And because her Home of Record was falsely reported, she was entitled to no benefits. Nevertheless, she made no effort to change her Home of Record back to Wichita once she was returned to McConnell Air Force Base after her injury. That is a sufficient showing of an intent to defraud the United States of lodging and per diem. *See United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997) ("Intent to defraud may be inferred from the defendant's misrepresentations [or] knowledge of a false statement.") (quotations omitted).

Service members are responsible for keeping the personal information contained in their personnel files, including their Home of Record, current. Bradley claims, however, that she could not have changed her Home of Record back to Wichita once she was injured and returned to McConnell Air Force Base because military regulations at that time would not allow a guard member to change her Home of Record while under active orders. *See supra* n.10. And, according to her, she had to remain under active orders not only because she was placed on a medical hold but also to remain eligible for health insurance. Her "any port in a storm" argument is unavailing. Nothing of record

entitlements in general." (R. Vol. 3 at 53.)

supports this argument, made for the first time on appeal. In any event, she changed her Home of Record from Wichita to Chandler while under active orders; she was unconcerned at that time as to whether the change was prohibited by military regulations. For her to now claim she could not have corrected an obvious fraud because military regulations prohibited her from doing so is disingenuous. If nothing else, Bradley could have alerted Armstrong or other employees in the Comptroller's Unit of her change in circumstance and asked that her Home of Record be corrected. Her failure to do so, while at the same time pocketing the money, is telling.[19]

Bradley also claims that after her injury she could not move to Chandler, Arizona, because she was placed on a medical hold which required her to remain at McConnell Air Force Base until she was cleared medically by a review board and that did not occur until April 23, 2011. We fail to see the relevance of this argument. While Bradley may have been required to remain at McConnell Air Force Base until her injuries were resolved, she was not required to falsely change her Home of Record to Chandler, Arizona, in the

---

[19] There were references throughout trial to military regulations and whether Bradley violated them. While certainly a violation of an agency regulation can provide proof of the elements of an offense, for instance, fraudulent intent, Bradley was not on trial for violating military regulations. *See United States v. Ransom*, 642 F.3d 1285, 1291-92 (10th Cir. 2011) (although the rules and regulations of the government agency helped establish the underlying facts necessary to prove the crimes of wire fraud and theft of public money, defendant was not being held criminally liable for violating the rules and regulations). As the district judge aptly stated: "We're talking about fraud here, not some sort of violation of Air Force regulations." (R. Vol. 3 at 292.) "[T]he issue before the jury was whether the address listed by [Bradley—her father's address—] was a false and material statement and was made in furtherance of a scheme to obtain money from the government using false [or fraudulent] pretenses." (R. Vol. 1 at 103 n.2.) The jury said yes and there was sufficient evidence to support its verdict.

first place or to perpetuate the fraud by not correcting the "misunderstanding" once she was returned to Wichita after her injury. *See supra* pp. 9-11 (reasonable reliance discussion).

Finally, she claims it was entirely reasonable for her to change her Home of Record from her apartment in Wichita to her father's address in Chandler because at the same time she received her orders, her husband also learned he was going to be deployed overseas.[20] According to her, and acknowledged by Armstrong at trial, "[s]ince [Bradley and her husband] were both deploying, there's no sense of leaving a house open if you're both [going to] be gone." (R. Vol. 3 at 164.) Thus, on April 1, 2009, Bradley's husband gave the apartment manager the required sixty-day notice to cancel the apartment's lease; the apartment was vacated on June 27, 2009. Consequently, Bradley argues, when she changed her Home of Record on April 10, she knew she would not be returning to the Wichita apartment.

But, once again, a physical move of belongings is required in order to justify a change in a guard member's Home of Record and Bradley knew this. Yet, at the time Bradley changed her Home of Record on April 10, she was still living in the apartment in Wichita. Although she claimed to have moved belongings to a friend's address in Phoenix, Arizona, in February 2009, the evidence supporting her claim was equivocal. Other evidence was not. She did not list her friend's address as her Home of Record.

---

[20] His deployment was later changed to a Permanent Change in Duty Station to Turkey.

Instead, she listed her father's Chandler address and, as her father testified, she had moved no belongings to his address.[21]  Moreover, and tellingly, her grandfather testified to having helped her move her belongings to a storage unit in Wichita in May 2009.  And, of course, we have Bradley's admission that she changed her Home of Record in order to receive increased benefits while deployed and her failure to change her Home of Record back to Wichita once she was required to return there after her injury.  The jury could, and apparently did, conclude that her claimed move of belongings to Arizona did not occur.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

[21] Her father testified about it.  According to him, Bradley and her husband drove to his house in Chandler, Arizona, for a visit in February 2009.  Although they brought a number of items with them, he believed they left with everything they had brought.  But he could not say for sure because he did not know exactly what they had brought to Arizona.  He also said Bradley and her husband had visited friends during their stay in Arizona; those friends included Alicia Young, the friend Bradley had referenced in her interview with investigators.  While this testimony could support a number of inferences, a plausible one is that Bradley left no items with Young.  In any event, her father stated unequivocally she had not left any belongings at his address, the address she listed as her Home of Record.