[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11712

_____

D.C. Docket No. 2:11-cr-00083-JES-SPC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

PETER HESSER,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 8, 2015)

Before TJOFLAT and FAY, Circuit Judges.[*]

PER CURIAM:

In this appeal, Peter Hesser challenges his convictions for three counts of

submitting false claims, in violation of 18 U.S.C. § 287, and one count of

_____

[*]The Honorable Jill Pryor, Circuit Judge, heard oral argument and thereafter recused. We therefore decide this case as a quorum. 28 U.S.C. § 46(d).

attempting to evade or defeat a tax imposed by the Internal Revenue Code, in violation of 26 U.S.C. § 7201.  The three false-claims counts relate to income tax returns Hesser filed for 2005, 2006, and 2007.  The tax-evasion count relates to actions Hesser took to avoid paying income taxes he owed for 2001, 2002, and 2003.

Hesser challenges both his convictions and his sentence on multiple grounds.  First, with regard to the false-claims counts, he contends that there was insufficient evidence that his filings were actually false.  Second, as to the tax-evasion count, he argues that the Government failed to prove that he had a tax deficiency for 2001–2003 or that he willfully committed any affirmative act of tax evasion.  Third, Hesser identifies a number of other errors, which, he claims, individually or cumulatively rendered his trial fundamentally unfair.  Fourth, Hesser argues that the District Court erred in applying a two-level obstruction-of-justice enhancement in determining his sentence range under the Sentencing Guidelines.  Finally, Hesser contends that the District Court erred when it ordered him to pay more in restitution to the Internal Revenue Service ("IRS") than the agency actually lost.

Of these challenges, only the last has merit.  Accordingly, though we affirm Hesser's conviction and sentence of imprisonment (with the period of supervised release) imposed with the application of the obstruction-of-justice enhancement,

2

we vacate the court's restitution order and remand the case for reconsideration of the restitution due the IRS.

## I.

## A.

For our purposes, the chain of events leading to this appeal began in 2002, when Hesser failed to file a personal income tax return for 2001. At that time, Hesser was the president of PPCH Company, a painting contracting business in Port Charlotte, Florida. Hesser had incorporated PPCH in 1998, and he and his wife, Cheryl Hesser, were the company's sole shareholders. PPCH similarly failed to file a corporate tax return for 2001 by the corporate filing deadline of March 15, 2002. In February of 2003, however, Hesser reversed course and filed corporate tax returns for PPCH for 2001 as well as 2002, both of which reflected small net losses (and thus no tax liability).[1] In April of 2003, Hesser filed a personal tax return for 2002, which claimed a refund for that year. In 2004, Hesser filed a personal tax return for 2003, which claimed a refund for that year.[2]

In 2004, after noticing that Hesser had claimed a refund for 2002 but had not filed a tax return in 2001, the IRS flagged Hesser's returns for further review. The

---

[1] PPCH ceased operation sometime around the beginning of 2003 and did not file a return for that year.

[2] Hesser filed his 2002 and 2003 returns jointly with his wife. To simplify matters, and because Hesser is the relevant tax payer for purposes of this appeal, we refer to these returns as being filed by Hesser alone. Similarly, we discuss actions taken by the IRS in response to these filings as if directed solely at Hesser.

3

ensuing investigation soon was expanded to include PPCH's tax returns as well. Pursuant to that examination, Piksum Blau, an IRS revenue agent, attempted to contact Hesser to set up an audit appointment. When Hesser failed to cooperate, Agent Blau scheduled a "firm appointment" for Hesser to meet with her and produce books and records verifying PPCH's income and expenses. Hesser failed to appear, so Agent Blau summonsed Hesser and the banks at which PPCH had accounts to obtain financial records for the years in question.

Hesser responded to several of these summonses with letters drafted by his then-counsel, Milton Baxley.[3] In these letters, Hesser demanded evidence of the authority for the IRS's investigation and purported to refuse the summonses on behalf of the banks. The letters asserted, variously, that the summons were barred by Federal Rule of Criminal Procedure 9(b), that the IRS's authority limited to taxpayers living outside the United States, and that the IRS only had authority to administer the Internal Revenue Code, not enforce it. Agent Blau wrote back to inform Hesser that his arguments were meritless. She urged him not to be misled by people who make dubious claims about the federal tax laws and entice others to

---

[3] Baxley had been enjoined on December 29, 2003, from representing clients before the IRS. *United States v. Kahn*, 2006 WL2037165, at *3–*4 (M.D. Fla. July 18, 2006). He was subsequently imprisoned for violating this injunction, Dep't of Justice, Press Release, *Florida Lawyer Sentenced to Prison for Violating Court Order To Stop Promoting Abusive Scheme* (Nov. 2, 2006), *available at* http://www.justice.gov/tax/txdv06747.htm, and was disbarred in Florida for five years effective December 19, 2006. *Florida Bar v. Baxley II*, No. SC06-2430, at 14 (Fla. 2007).

4

deliberately violate those laws. Because the federal courts had repeatedly rejected his objections, Agent Blau explained, she would not engage in further dialogue on the points he had raised.

Using summonsed bank records and information already in the IRS's possession, Agent Blau established that Hesser had received unreported constructive dividends from PPCH.[4] In other words, Hesser had been using PPCH funds for personal expenses without reporting the transfers as income.[5] Agent Blau ultimately determined that PPCH had underreported $75,887 of income on its 2001 return, resulting in a $13,615 tax deficiency, and that for tax year 2002, the company had underreported $99,822 of income, resulting in a $19,465 deficiency. Based on the same unreported dividends, Agent Blau determined that Hesser had personal tax deficiencies for 2001, 2002, and 2003: $16,685 for tax year 2001, $26,506 for 2002, and $4,455 for 2003.[6] Agent Blau proposed adjustments to the returns for those years.

---

[4] A constructive dividend arises when a corporation confers an economic benefit on a shareholder from available earnings and profits without expectation of repayment, "even though neither the corporation nor the shareholder intended a dividend." *Welle v. Comm'r*, 140 T.C. 420, 422–23 (2013)(citation omitted).

[5] Agent Blau concluded that Hesser had been the beneficiary of constructive dividends by comparing the bank-account records of Hesser and PPCH. On a number of occasions, when a check was drawn by PPCH payable to cash, a corresponding deposit was made in Hesser's personal account. The records also revealed that Hesser frequently used PPCH checks to pay for personal expenses.

[6] Because Hesser failed to file a personal return for 2001 Agent Blau prepared a placeholder return for him, called a Substitute for Return.

After sending preliminary notices to Hesser and PPCH, the IRS sent a statutory notice of deficiency (commonly called a "ninety-day letter") to Hesser for PPCH on October 6, 2005.  The letter detailed the results of Agent Blau's audit of PPCH and explained that PPCH had ninety days to contest the IRS's deficiency determination by petitioning the United States Tax Court.

On April 3, 2006, the IRS sent Hesser a ninety-day letter notifying him of the deficiency assessments for 2001, 2002, and 2003.  Three days later, on April 6, Hesser and his wife quitclaimed the family home to a trust operated by Michael Harris, the administrator of Power N Unity.  Hesser, testifying at his trial, said that the purpose of the transfer was not to evade payment of the assessments.  Rather, as Harris testified, the Hessers transferred the house so that Power N Unity could investigate the circumstances surrounding the execution of their mortgage and, if fraud were discovered, take legal action.

Nearly a year later, on March 14, 2007, the IRS filed federal tax liens against Hesser based on the April 3, 2006, assessments.  On April 3, 2007, Connie Lewis, an IRS revenue officer, visited the Hessers' home.  The purpose of her visit was to try to persuade Hesser to voluntarily comply with the IRS's collection of the assessed taxes.  Typically, this process begins with the taxpayer filling out "[a] financial statement listing assets, income, liabilities, and expenses submitted by the taxpayer," known as a Collection Information Statement ("CIS").  I.R.M. 5.8.1-1.

6

Hesser refused to fill out the CIS, telling Officer Lewis he had already "wasted enough time" with the IRS. Officer Lewis then served Hesser with a summons to prepare the CIS at her office, along with a final notice of intent to levy if payment was not forthcoming.

Two weeks prior to the scheduled meeting with Officer Lewis, on April 16, 2007, Hesser bought $262,000 worth of gold and silver bullion and had it shipped to his house. Hesser testified that he purchased the bullion in consultation with his mother, for the benefit of, and using funds provided by, Riverside Trust, a family trust that had originally been set up by his father. Hesser's brother was the trustee at the time, and he had previously transferred $301,000 of the trust's money to an account controlled by Hesser for him to invest. Cheryl Hesser testified that when the bullion arrived, Hesser hid it around the house because he was afraid that if IRS agents came, they would find it. Hesser explained that the bullion was shipped to his house for safety reasons, but that shortly after receiving it, he transferred it to his mother's possession and she placed most of it in a safe deposit box.

When the time came for the meeting with Officer Lewis on April 30, 2007, Hesser showed up, but was uncooperative. First, he brought a friend who was not licensed to represent taxpayers before the IRS. Then, as the meeting began, he questioned Officer Lewis's authority to conduct it. He refused to accept

7

her credentials, which she showed him, and demanded to see further identification. He also demanded that she sign an "incrimination waiver." She refused. Officer Lewis warned Hesser that if he did not answer her questions and provide the documents she was requesting, she would end the interview and the IRS would enforce the summons. Hesser refused to cooperate, so she ended the meeting.

After the summons were referred to the U.S. Attorney's Office for enforcement, the IRS reassigned Hesser's case to another revenue officer, Chuks Bailey. On December 27, 2007, upon discovering that Hesser's home and office telephone numbers had been disconnected, Officer Bailey sent Hesser successive letters warning him that if he failed to pay his taxes, the IRS would soon take enforcement action against him. Hesser responded with letters that Officer Bailey deemed frivolous.[7] In the following weeks, levies were directed to several of Hesser's bank accounts, but were met with little success. Either the accounts had been closed or had negligible balances.

## B.

The CIS summons enforcement, tax liens, and levies were still pending when, on October 1, 2008, Officer Bailey sent Hesser yet another notice warning of impending enforcement action against him. Six days later, Hesser's tax

---

[7] The letters demanded that Officer Bailey pay Hesser the amount of the deficiency, asserted that the Internal Revenue Code did not apply to Hesser, and declared the IRS's case against him to be closed.

preparer, Teresa Marty,[8] filed on Hesser's behalf the first of three income tax returns, which, the IRS later determined, contained false information.

On the first filing, a Form 1040 for 2007, Hesser claimed that $296,246 in federal income taxes had been withheld on his behalf, entitling him to a $215,219 refund. The IRS did not immediately discover the falsity of Hesser's requested refund. Instead, the agency processed the refund, paid off Hesser's tax liabilities for 2001, 2002 and 2003, released the federal tax liens and closed its enforcement case, and sent him a check for $123,495.18—the residual amount of his refund after the credits, penalties, and interest associated with his tax deficiencies for 2001, 2002, and 2003.

On October 31, 2008, Marty submitted a Form 1040 on Hesser's behalf for 2006, claiming a $39,135 refund on the basis of attached Forms 1099-OID. These forms indicated that $44,731 in federal income tax had been withheld on his behalf. Federal income taxes had not, in fact, been withheld on Hesser's behalf. Rather, the dollar amounts Hesser listed were the amount of his debts to various financial institutions. On January 5, 2009, Hesser, again through Marty, filed a Form 1040 for 2005. He again claimed a refund—$226,911—on the basis of

---

[8] Teresa Marty has since been indicted in the Eastern District of California for conspiring to defraud the United States, making false claims against the United States, filing false retaliatory liens, conspiring to defraud the IRS, and unauthorized disclosure of a social security number, in violation of 18 U.S.C. §§ 2, 286–287, 371, and 1521 and 42 U.S.C. § 408(a)(8). Superseding Indictment, *United States v. Marty*, No. 2:13-cr-00217-KJM (E.D. Ca. Aug. 15, 2013).

attached Forms 1099-OID, which indicated that $316,806 in federal income tax had been withheld on his behalf.[9] The IRS became suspicious of the validity of these claims and did not process the refunds sought in the 2005 and 2006 returns.

Upon flagging as erroneous the refund Hesser received for 2007, the IRS promptly cancelled the refund and assessed the $296,246 allegedly withheld against his account. Back on the case, Officer Bailey was able to locate a working telephone number for Hesser, and on February 27, 2009, he called and spoke with Hesser. Hesser refused to provide any information over the phone and abruptly hung up. Officer Bailey proceeded to investigate the accounts into which Hesser had deposited the proceeds from the $123,495.18 refund check and to secure the necessary authorization for a jeopardy levy[10] to try to recoup the misappropriated funds. After receiving approval, Officer Bailey sent notice of the levy to several banks connected with Hesser.

On May 14, 2009, Officer Bailey visited the Hessers' home to deliver a copy of the jeopardy levy notice and inform Hesser of his rights to appeal the levy. There, he encountered a sign warning federal employees to steer clear of the premises or face prosecution for trespassing. Fearing for his safety, Officer Bailey

---

[9] Cheryl Hesser, who had previously filed individual tax returns for 2005 and 2006, filed amended returns for those years, claiming refunds of $95,389 and $107,374, respectively. Her returns, like Hesser's, were prepared by Teresa Marty.

[10] In situations in which the IRS determines that collection of a tax deficiency is in jeopardy, it may dispense with the normal notice and waiting-period requirements before attempting to levy the taxpayer's assets. *See* IRC §§ 6331(d)(3).

10

called his supervisor for advice and then left the documents attached to the front door.

Officer Bailey had limited success recovering the refunded money.  He was able to attach $3,835.43 that remained in the account into which the $123,495.18 check had originally been deposited. But, by the time of the levy, Hesser had moved the bulk of the funds to an account at another bank in the name of Hesser Enterprises, Inc.  After serving a summons on that bank, Officer Bailey determined that the money had then been transferred to a third bank, where it was deposited into an account held by Riverside Trust.  Account records obtained by Officer Bailey indicated that in the months following the deposit, checks totaling $38,000 dollars had been written from the Riverside Trust account to Hesser Enterprises, Inc.

## C.

After consulting an IRS technical adviser specializing  in tax fraud, Officer Bailey referred Hesser's case to the IRS Criminal Investigation Division.  A grand jury investigation ensued.  On September 14, 2011, a three-count indictment was returned against Hesser, charging him with knowingly making false claims upon the United States in connection with his 2005, 2006, and 2007 tax returns, in

11

violation of 18 U.S.C. § 287.[11]  A superseding indictment, returned on October 3,

2012, charged Hesser with a fourth count of willfully attempting to evade the

payment of income taxes for 2001, 2002, and 2003, in violation of  26 U.S.C. §

7201.[12]  The indictment specified several acts of evasion supporting that count:

> [A]mong others: (1) attempting to remove his assets from the
> examination of the Internal Revenue Service by converting his assets
> to gold, and filing a Quit Claim deed on his personal residence; (2)
> filing a fraudulent 2007 tax return to obtain a refund by portraying
> false 1099-OID claims; and (3) filing two additional false income
> taxes returns for the years 2005 and 2006 in an attempt to evade his
> outstanding tax liabilities by claiming significant fraudulent refunds to
> settle numerous outstanding tax liabilities.

Cheryl Hesser was separately indicted for filing false amended returns for 2005

and 2006 and a false return for 2007, all in violation of 18 U.S.C. § 287.  She

retained her own attorney, pleaded guilty to filing a false tax return for 2006, and

testified against her husband at his trial.

### D.

---

[11] 18 U.S.C. § 287 provides:

> Whoever makes or presents to any person or officer in the civil, military, or naval
> service of the United States, or to any department or agency thereof, any claim
> upon or against the United States, or any department or agency thereof, knowing
> such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than
> five years and shall be subject to a fine in the amount provided in this title.

[12] 26 U.S.C. § 7201 provides:

> Any person who willfully attempts in any manner to evade or defeat any tax
> imposed by [the Internal Revenue Code] or the payment thereof shall, in addition
> to other penalties provided by law, be guilty of a felony and, upon conviction
> thereof, shall be fined not more than $100,000 . . . , or imprisoned not more than 5
> years, or both, together with the costs of prosecution.

At Hesser's trial, the Government's witnesses included IRS employees who described the course of their investigation into Hesser's tax deficiencies for 2001, 2002, and 2003, as well as an IRS records administrator through whom the Government introduced Hesser's tax returns and the administrative records associated with his account. At the close of the Government's case-in-chief, Hesser moved for a judgment of acquittal on Count Three on the ground that the Government failed to prove that he had personally submitted the Form 1040 for 2007 because it contained only his electronic PIN, not his written signature.[13] The District Court denied the motion.[14]

Hesser's defense consisted of his testimony and the testimony of several of his family members, Teresa Marty, and Michael Harris. The District Court thereafter sentenced Hesser to a prison term of 36 months, to be followed by 36 months of supervised release, and ordered that he pay IRS restitution in the sum of $296,246.[15]

---

[13] Hesser contends that he also moved the District Court for a judgment of acquittal on Count Four. While it is possible that the District Court may have understood Hesser to have done so, Hesser waived the issue by failing to renew his motion after the close of his case. *See United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994).

[14] Hesser does not take issue with this ruling on appeal.

[15] The District Court sentenced Hesser to concurrent prison terms of 36 months and concurrent supervised release terms of 36 months.

13

II.

In this appeal, Hesser first challenges the sufficiency of the evidence to convict him on Counts One through Three of the indictment, each charging him with submitting a false claim to the IRS in violation of 18 U.S.C. §287.  Hesser did not move the District Court at trial for a judgment of acquittal on any of the these counts on the ground that the evidence was insufficient to convict.  Consequently, we will not disturb the conviction on any of those counts unless it is "necessary to to prevent a manifest miscarriage of justice," meaning that "the evidence on a key element of the offense [must be] so tenuous that a conviction would be shocking." *United States v. Greer*, 440 F.3d 1267, 1271 (11th Cir. 2006) (quoting *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002) (quotation marks omitted). Under this standard of review, we may consider evidence both from the Government's case-in-chief and that put on by the defense.  *See United States v. White*, 611 F.2d 531, 535–36 (11th Cir. 1980).

To prove a violation of 18 U.S.C. § 287, the Government must establish that: (1) the defendant presented a claim against the United States to an agency or department thereof; (2) such claim was false, fictitious, or fraudulent; and (3) the

14

defendant knew that the claim was false, fictitious, or fraudulent.  *Id.*[16]  Hesser

challenges only the second of these elements, claiming that the Government failed

to put on *any* evidence that Hesser's 2005–2007 tax returns or attached Forms

1099-OID were false.  Although we agree that the Government's evidentiary

presentation was deficient, when the record is considered in its entirety, the

evidence on the issue of falsity is not so paltry as to render Hesser's false-claims

convictions manifestly unjust.

### A.

"When bonds and certain other debt instruments are issued at a discount to

the value at maturity, the difference between the issue price and the redemption

value is called 'original issue discount' (OID)."  *United States v. Rampton*, 762

F.3d 1152, 1153 (10th Cir. 2014).  In essence, that discount is a form of interest

income, taxable under federal law.  *See* IRS Pub. 1212, 2 (2014), *available at*

---

[16] In *United States v. Slocum*, 708 F.2d 587 (11th Cir. 1983), we stated that in addition to these elements, the defendant must also have had "the specific intent to violate the law or . . . a consciousness that what he was doing was wrong."  *Id.* at 596 (citing *United States v. Comput. Sci. Corp.*, 511 F. Supp. 1125, 1134 (E.D. Va. 1981), *rev'd on other grounds*, 689 F.2d 1181 (4th Cir. 1982).  But the district court decision we cited for that specific intent element did not say that "specific intent. . . ." was required to convict a defendant of violating 18 U.S.C. § 287.  More importantly, in *United States v. Cook*, 586 F.2d 572, 574–75 (5th Cir. 1978), five years prior to our *Slocum* decision, we held that the government need *not* prove willfulness to convict under § 287.  *Id.*; *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding all decisions of the former Fifth Circuit issued prior to October 1, 1981).  As our prior-panel-precedent rule requires that we follow the earlier of two inconsistent intra-circuit decisions, *United States v. Puentes-Hurtado*, No. 13-12770, 2015 WL 4466279, at *7 (11th Cir. July 22, 2015), we therefore follow *Cook*'s holding that specific intent is not a required element of § 287.

15

http://www.irs.gov/pub/irs-pdf/p1212.pdf (defining original issue discount). For example, if a taxpayer pays $750 for a bond with a stated redemption price of $1,000, the taxpayer effectively receives $250 in OID. Although the taxpayer does not receive the full value of this discount until the bond or other instrument is redeemed, IRS regulations require the taxpayer to amortize the amount over the life of the instrument. *See* I.R.C. §§ 1272–73.

Financial institutions are required to report the amortized amount of the discount to the taxpayer and to the IRS each year using Form 1099-OID.[17] That form details the entity that issued the instrument (the payer), the investor who purchased the instrument (the recipient), the amount of original issue discount for the year, any other interest on the instrument, any early-withdrawal penalty, and the amount of federal income tax withheld. In certain situations, the financial institution holding or issuing the instrument is also required to preemptively withhold and remit a percentage (currently 28 percent) of the OID to the IRS on the taxpayer's behalf. *See* I.R.C. § 3406; *see also* IRS Pub. 1212, at 5.

Hesser submitted 1099-OID forms in connection with his tax returns that purported to show both that he had accumulated large amounts of OID from investing in various debt instruments and that the issuing financial institutions had

---

[17] Financial institutions are primarily responsible for generating these forms, but in certain circumstances, an individual might legitimately file a 1099–OID form as well. *United States v. Rampton*, 762 F.3d 1152, 1154 (10th Cir. 2014).

16

preemptively withheld 100 percent of that OID.  Since only a percentage of OID is taxable, Hesser's tax returns claimed that he was due a large refund as a result of the over-withholding.

For example, on a Form 1099-OID filed with his 2006 tax return, Hesser reported that he had $16,683.34 in OID in connection with an account at Capital One Bank.  In doing so, he represented to the IRS that he had purchased a debt security issued by Capital One Bank at a discount and that he had realized $16,683.34 of the discount in tax year 2006.  Hesser then reported the same figure, $16,683.34, in the box labeled "Federal income tax withheld,"  thereby representing to the IRS that Capital One Bank had withheld on his behalf $16,683.34 in federal income tax.  And when he added this figure to another claimed withholding in the amount of $28,048 from Washington Mutual Bank FA, and then indicated on his Form 1040 that $44,731 in federal income tax had been withheld on his behalf, Hesser represented to the IRS that he was entitled to a substantial refund.

### B.

Hesser argues that the Government failed to prove that these claims were false.  He points out that the Government never explained to the jury what OID is or how it is properly calculated.  Nor did it put on any evidence to prove that Hesser had *not* actually purchased the debt instruments underlying the thousands of

17

dollars of OID reflected on the 1099-OID forms, or that the financial institutions listed on the forms had *not* actually withheld and remitted those amounts to the IRS on his behalf. Instead, the Government presented—at great length—Hesser's outlandish ideas about OID and the appropriate use of Form 1099-OID.[18] Hesser argues that the evidence was insufficient as a matter of law to prove that he submitted false claims because the Government did nothing more than present his beliefs and scoff at them.

We disagree. The jury did not need to understand the intricacies of OID in order to conclude that Hesser's claims were false. The relevant claims are not Hesser's reported OID amounts. They are, instead, that federal income tax had been preemptively withheld on his behalf and that he was entitled to its return. If Hesser had simply over-reported his OID, this would have *increased* his taxable income, and thereby, his tax liability. This might have been a false *statement* for the purposes of 18 U.S.C. § 1001, but it would not have been a false *claim* for the purposes of § 287. *See, e.g.*, *United States v. Allen*, 13 F.3d 105, 108 (4th Cir. 1993) ("Section 287 requires proof that a false *claim* was made against the government, a fact that section 1001 does not require, because not every false statement to government officials comprises a claim against the government for

---

[18] We will not attempt to render coherent Hesser's tax theory, as it is not material to his appeal. For a rough explanation, see generally Jen E. Ihlo & Erin B. Pulice, *Prosecuting Tax Defier and Sovereign Citizen Cases—Frequently Asked Questions*, U.S. Attorneys' Bull., Mar. 2013, at 49–52.

money or services."). But when Hesser went further and represented that various financial institutions had withheld and remitted to the IRS the entire amount of the over-reported OID, he *did* present affirmative claims against the federal government. These were the claims the jury was asked to evaluate.

Although the Government may have neglected to establish the falsity of Hesser's claims, Hesser's own testimony provided the jury with substantial evidence that the claims were not valid. Hesser testified at trial that the dollar amounts listed in the "original issue discount" and "federal income tax withheld" boxes of his 1099-OID forms were in fact neither interest income nor federal taxes withheld on his behalf. Instead, he admitted, they represented the amount of debt he owed to the financial institutions listed on the forms.[19] This was sufficient evidence from which the jury could conclude that Hesser's claims were false.

---

[19] The exchange went as follows:

[Defense Counsel]. Now, on [your 2006 1040 income tax] return, does that return have some 1099s attached to it?

[Hesser]. Yes. It has two.

[Defense Counsel]. Describe them for me, please.

[Hesser]. There is one 10 -- excuse me, one 1099 OID from Capital One. It's one of my credit cards.

. . .

[Defense Counsel]. What are you -- what do you think is evidenced by that 1099 OID?

[Hesser]. The amount of credit that I signed my name to throughout the year is what I was told that would be entered into the 1099 OID.

Although Hesser only testified about the contents of the Forms 1099-OID filed with his 2006 tax return, his 2005 return included substantially similar 1099-OID forms, with substantially similar claims.  For 2007, the Government did not enter into evidence Forms 1099-OID.  It did enter into evidence, however, Hesser's Form 1040, which claimed that he had received $296,244 in taxable interest income, and that the same amount of federal income tax had been withheld on his behalf, entitling him to a $215,219 refund.  Moreover, on the return's Schedule B, Hesser listed three accounts from which he supposedly received $296,244 in interest income: $13,500 from Capital One Bank; $20,744 from Washington Mutual Bank FA; and $262,000 from GTE Federal Credit Union.  The jury could reasonably have compared the claims on all three returns and concluded that Hesser perpetrated the same fraud on the Government in 2005 and 2007 as he did in 2006, falsely listing as withheld taxes the amounts he owed to his creditors.

---

[Defense Counsel]. Can I take -- can you move to the next 1099 in that exhibit?

[Hesser]. Okay.

[Defense Counsel]. And what company is that?

[Hesser]. This is Washington Mutual Bank, which is another credit card of mine.

[Defense Counsel]. And to you, what does that document mean?

[Hesser]. It's the same thing as before.  It shows a figure of I believe $28,049.39, which would be credit card charges throughout that year.

20

Because of Hesser's own admission during his testimony, we cannot say that the evidence that his tax 2005–2007 tax returns were false is so tenuous that we must reverse his convictions to prevent a manifest miscarriage of justice.

## III.

Hesser also challenges the sufficiency of the evidence to convict him on Count Four, for tax evasion, in violation of  26 U.S.C. § 7201.  To prove a violation of § 7201, the Government must demonstrate (1) willfulness, (2) the existence of a tax deficiency, and (3) an affirmative act constituting an evasion or attempted evasion of the tax.  *United States v. Kaiser*, 893 F.2d 1300, 1305 (11th Cir. 1990) (citing *Sansone v. United States,* 380 U.S. 343, 351, 85 S. Ct. 1004, 1010, 13 L. Ed. 2d 882 (1965)).  Since Hesser failed to move the District Court for a judgment of acquittal on that count, *see supra* note 15, we review the conviction under the "manifest miscarriage of justice" standard we used in reviewing his convictions on Counts One through Three.

## A.

Hesser first asserts that the Government failed to prove the existence of a tax deficiency for years 2001–2003.  A tax deficiency is defined as the difference between the amount of a taxpayer's liability and the amount reported on his return. I.R.C. § 6211.  To prove the existence of a deficiency, the Government may simply establish that a formal tax assessment has become administratively final, as this is

21

a deficiency prima facie. *See United States v. Josephberg*, 562 F.3d 478, 488–89 (2d Cir. 2009); *United States v. Silkman*, 156 F.3d 833, 835 (8th Cir. 1998); *United States v. Voorhies*, 658 F.2d 710, 715 (9th Cir. 1981). Because IRS Form 4340 establishes prima facie that a tax has been validly assessed, *United States v. White*, 466 F.3d 1241, 1248 (11th Cir. 2006), the Government establishes that a deficiency exists by entering Form 4340 into evidence.

At trial, the Government presented Forms 4340 for the 2001, 2002, and 2003 assessments through the testimony of an IRS records administrator. Though taxpayer defendants are free to contest at trial the validity of an assessment shown via Form 4340, *see, e.g.*, *Silkman*, 156 F.3d at 835, Hesser did not do so. Thus, the Forms 4340 were sufficient to prove the existence of Hesser's deficiencies for 2001–2003.[20]

### B.

Hesser argues that the Government failed to prove that he willfully committed any affirmative act of tax evasion. To establish that a defendant acted willfully, the Government must prove the "'voluntary, intentional violation of a known legal duty.'" *United States v. Morris*, 20 F.3d 1111, 1114 (11th Cir. 1994) (quoting *Cheek v. United States*, 498 U.S. 192, 202, 111 S. Ct. 604, 610, 112 L. Ed

---

[20] Because this evidence sufficed to prove a deficiency, we need not address Hesser's argument that the District Court erred by failing to instruct the jury on the bank-deposits method of proving taxable income.

2d 617 (1991)).  That a defendant acted willfully may be inferred from his conduct.  *See United States v. Daniels*, 617 F.2d 146, 148–49 (5th Cir. 1980).  An affirmative act of attempted evasion may consist of "any conduct, the likely effect of which would be to mislead" the Government or conceal funds to avoid payment of a valid tax deficiency.  *Id.* at 148 (quoting *Spies v. United States*, 317 U.S. 492, 499, 63 S. Ct. 364, 368, 87 L. Ed. 418 (1943)).

The acts of evasion specified in the indictment were Hesser's (1) attempting to remove his assets from the examination of the IRS by converting his assets to gold and silver and quitclaiming his and his wife's house to a trust, (2) filing a fraudulent 2007 tax return, and (3) filing additional false income tax returns for 2005 and 2006.  The Government had only to prove one of these several acts, which were alleged conjunctively in the indictment.  *United States v. Edwards*, 777 F.2d 644, 650 (11th Cir. 1985).

Hesser does not contend that he was unaware of his legal duty to pay taxes, *cf. Morris*, 20 F.3d at 1114, nor could he.  The record reflects that the IRS showered Hesser with a veritable snowstorm of notices, a number of which he responded to.  Specifically, the IRS sent him preliminary notice of the results of its investigation into his 2001–2003 tax returns during the summer of 2005, as well as ninety-day notices regarding the same on January 25, 2006**.**  Each of the acts of evasion alleged in the indictment occurred after these dates.

23

As to the acts of evasion specified in the indictment, even giving Hesser the benefit of the doubt that the jury credited his alternative explanations for purchasing $262,000 worth of precious metals and quitclaiming ownership of his house to a trust, there was ample evidence from which a jury could have found that Hesser willfully filed his 2007 tax return to evade the payment of taxes. The Government established that Hesser filed the 2007 return just days after receiving notice of an impending enforcement action against him. After he filed the return, the IRS applied a credit against his 2001–2003 tax liabilities and released the federal tax liens on his residence. Hesser's sole contention on this point is that because the Government failed to prove that his 2007 return was actually false, it cannot serve as evidence of an affirmative act of tax evasion. As we have explained above, this argument is without merit. *See supra*, Part II.B.

We need not delve into the sufficiency of the Government's proof of the other acts alleged in Count Four of the indictment. The evidence that Hesser willfully committed at least one affirmative act of attempted tax evasion is not shockingly tenuous. *See Greer*, 440 F.3d at 1271

## IV.

In addition to his sufficiency challenges, Hesser points to a number of other errors which, he claims, individually and cumulatively, deprived him of a fair trial. Hesser's counsel did not object to any of these alleged errors at trial. Thus,

24

to garner consideration on appeal, they must rise to the level of plain error. *United States v. Smith*, 459 F.3d 1276, 1287 (11th Cir. 2006); Fed. R. Crim. P. 52(b).  "To find plain error, there must be: (1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights."  *United States v. Khan*, No. 13-14048, 2015 WL 4480919, at *8 (11th Cir. July 23, 2015) (quoting *United States v. Edmond*, 780 F.3d 1126, 1130 (11th Cir. 2015)).  If we find that these conditions are met, we may exercise our discretion to recognize a forfeited error, but only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) (per curiam) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508 (1993)).

Defining our terms, an "error" is simply a deviation from a legal rule. *Olano*, 507 U.S. 732–33; *see also id.* at 733–34 ("Although in theory it could be argued that if the question was not presented to the trial court no error was committed by the trial court, hence there is nothing to review, this is not the theory that Rule 52(b) adopts.  If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b). . . .") (alteration omitted) (citation omitted) (quotation marks omitted).  "Plain" error means that the legal rule is clearly established at the time the case is reviewed on direct appeal, *Johnson v.*

*United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997). "[W]here the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) (per curiam). Such error must be so clearly established and obvious "that it should not have been permitted by the trial court even absent the defendant's timely assistance in detecting it." *United States v. Prieto*, 232 F.3d 816, 823 (11th Cir. 2000).[21] Substantial rights are affected if there is a reasonable probability of a different result absent the error. *United States v. Bennett*, 472 F.3d 825, 831–32 (11th Cir. 2006) (per curiam).

## A.

First, Hesser contends that the District Court, in its charge to the jury, constructively amended Count Four to charge tax evasion on the basis of filing false returns in 2001–2003, in addition to the three affirmative acts specified in the

---

[21] Hesser's briefs on appeal cite no authority that would have informed the District Court that the errors cited in subparts A through F *infra* were so clearly established and obvious, i.e., plain, that the court should have intervened *sua sponte* to preclude them from occurring or, if they had already occurred in the jury's presence, alleviate any prejudice they may have caused, e.g., via cautionary jury instructions.

indictment.  Because Hesser fails to show that his substantial rights were affected,

he cannot prevail on his claim of constructive amendment.[22]

A constructive amendment "occurs when the essential elements of the

offense contained in the indictment are altered to broaden the possible bases for

conviction beyond what is contained in the indictment."  *United States v. Keller*,

916 F.2d 628, 634 (11th Cir. 1990).  Hesser argues that the District Court went

beyond the bases for conviction contained in the indictment when it instructed the

jurors that they could convict Hesser of tax evasion if they found that he

knowingly failed to report all of the income he knew he was required to report.[23]

---

[22] Hesser frames the issue as one of constructive amendment, rather than variance.  *See United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990) (explaining the difference between the two concepts).  The distinction does not affect our analysis, due to his failure to object at trial, so we assume without deciding that his framing is correct.

[23] The District Court, following the Eleventh Circuit's Pattern Instructions, instructed the jury as follows:

It is also a federal crime to willfully attempt to evade or defeat paying federal income taxes.  The [D]efendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt:

One: The [D]efendant owed substantial income tax in addition to the amount declared on his tax return;

Two: The [D]efendant knew, *when he filed that income tax return*, that he owed substantially more taxes than the amount reported on his return;

And three: The [D]efendant intended to evade paying taxes he knew . . . he was required by law to pay.

. . .

The word, "Attempt," indicates that the [D]efendant knew and understood that, during the particular tax year involved, he had income that was taxable, and that he had to report, by law, but he tried to evade or defeat paying the tax or a substantial portion of the

This instruction, Hesser argues, worked a reversible constructive amendment because the jury was permitted to find that his 2001–2003 acts—which were not charged in the indictment—were affirmative acts of attempted evasion.[24]

We agree that the District Court's statement could be taken to set forth a theory of criminal liability that was not charged in the indictment, and thus deviated from a legal rule. But even assuming that such error was plain, it is clear that the jury did not convict Hesser for his misconduct between 2001 and 2003. The Government's theory of the case centered not on his 2001–2003 returns, but on his evasive conduct following their filing. We are convinced that the jury understood this, as, during its deliberations, it asked the judge, in reference to Count Four of the indictment, "If we find that *all* of the 'following acts' have not

---

tax on that income *by failing to report all of the income he knew he was required by law to report.*

*See Eleventh Circuit Pattern Jury Instructions (Criminal Cases)* 107.1 (2010), available at http://www.ca11.uscourts.gov/pattern-jury-instructions.

[24] Hesser also suggests that if he was convicted of tax evasion on the basis of his 2001–2003 filings, the conviction would transgress the statute of limitations period, which for tax evasion is six years. IRC § 6531(2). Not only has Hesser waived any statute-of-limitations defense as to this act by failing to raise it below, *United States v. Najjar*, 283 F.3d 1306, 1308–09 (11th Cir. 2002) (per curiam), the argument fails substantively. The statute of limitations for tax evasion begins to run only upon the last affirmative act of evasion. *United States v. Hunerlach*, 197 F.3d 1059, 1064–65 (11th Cir. 1999); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (per curiam). Count Four was first charged in the superseding indictment, returned on October 3, 2012. The Government was thus only obligated to show that Hesser committed at least one affirmative act of evasion after October 3, 2006. As explained in Part III.B, *supra*, the jury was entitled to find that Hesser affirmatively acted to evade paying his taxes when he filed a fraudulent return on October 7, 2008.

been committed (1, 2, 3) but rather only two have been committed, can the Jury find the Defendant guilty of Count Four[?]"  In response, the District Court instructed the jury, "As to the 'following acts' requirement in Count 4, the government must prove beyond a reasonable doubt that the defendant committed at least one of the acts.  You must be unanimous in your decision as to which acts, if any, defendant committed."

In light of the jury's inquiry and the court's responsive instruction, we are satisfied that the jury based their decision on the three affirmative acts set forth in Count Four of the indictment, and not on Hesser's 2001–2003 tax returns.  Because there is no reasonable possibility that the jury would have reached a different verdict absent this error, Hesser was not prejudiced, and we decline to reverse on this ground.[25]

### B.

Next, Hesser argues that the District Court committed plain error by admitting his wife's testimony concerning his mistreatment of her and the couple's

---

[25] For the same reasons, we reject Hesser's argument that the Government also constructively amended the indictment by stating during closing argument that the Hessers' use of corporate funds as their own "represented their deliberate attempt to avoid taxes."  Assuming this was error, it was not plain error affecting Hesser's substantial rights.

29

children.[26]  He contends that this testimony violated Federal Rule of Evidence

404(b).[27]  We disagree.  The disputed testimony was probative of relevant issues at

trial, including Hesser's consciousness of guilt, *United States v. Hammond*, 781

F.2d 1536, 1540 (11th Cir. 1986), control over his wife's finances, *cf. United*

*States v. Mueller*, 74 F.3d 1152, 1155 (11th Cir. 1996), and intent to evade the

payment of taxes.  Moreover, Hesser fails to establish that any error that occurred

was plain and affected his substantial rights.

Relatedly, Hesser contends that the District Court committed plain error

when it failed to intervene when the prosecutor referred to this evidence during his

closing argument to the jury.  The prosecutor stated, in relevant part, that:

---

[26] Cheryl Hesser testified about the following: that shortly before trial, she had moved out of the family home and into what she characterized during her testimony as a "safe house"; that Hesser tried to get her to change her testimony; that he told her that she needed to heed the Bible's command to submit to her husband and do what he said; that she signed the tax filings in evidence because she was "concerned about Mr. Hesser's reaction and its impact" on her and their children; that Hesser was "overbearing," "relentless," and "demanding"; that Hesser instructed her and the children to hide from the IRS should agents visit the family's home, an instruction that scared the children; that, upon her agreeing to testify, Hesser told their children that she was being a bad mother and was betraying him; and that Hesser's actions harmed her reputation.  Hesser does not argue that the evidence was improperly admitted under Fed. R. Evid. 403.

[27] That rule states, in relevant part:

(b) Crimes, Wrongs, or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Fed. R. Evid. 404.

[Hesser is] not on trial for being arrogant, or greedy, or using his intimidation over his wife, or trying to threaten his children to have their mother testify differently than she testified to you today.  That's not what he's in trial for.  He's not on trial for the Biblical quotes that he attempted to use so that she would follow him blindly.

As noted above, the bulk of the testimony to which this argument refers was properly admitted for non-character purposes.  And as for the prosecutor's statements concerning Hesser's supposed greed and arrogance, Hesser has failed to cite any authority that would have informed the District Court that any of these statements were improper.

## C.

Hesser further contends that "[t]he government violated the marital privilege and implicated the rule in *Massiah* [*v. United States*, 377 U.S. 201, 84 S. Ct. 1199 (1964),] by introducing privileged spousal communications between" him and his wife.  This argument borders on frivolous.  Hesser's invocation of *Massiah* is pure nonsense: that case involves the right to counsel under the Sixth Amendment to the Constitution, not spousal communications or testimony.[28]  We assume that Hesser means to invoke the confidential-communications marital privilege.  *Cf. United States v. Singleton*, 260 F.3d 1295, 1297 (11th Cir. 2001) (per curiam) ("There are

---

[28] If Hesser intended to argue that the Government violated the Sixth Amendment by using his wife to deliberately elicit information from him, he has wholly failed to develop this argument, and thus we consider it waived.  *Flanigan's Enters., Inc. of Ga. v. Fulton Cnty.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (per curiam), *superseded by statute on other grounds as recognized in* 596 F.3d 1265 (11th Cir. 2010).

31

two recognized types of marital privilege: the marital confidential communications privilege and the spousal testimonial privilege."). That argument fails, however, because he waived that privilege by failing to object to his wife's testimony at trial. *See United States v. Vo*, 413 F.3d 1010, 1017 (9th Cir. 2005).

## D.

Hesser contends that the District Court plainly erred by failing to contemporaneously instruct the jury that they could only permissibly consider Cheryl Hesser's guilty plea for limited purposes. *See, e.g.*, *United States v. Countryman*, 758 F.2d 574, 577–78 (11th Cir. 1985). During Cheryl Hesser's testimony, the Government introduced, without objection, her guilty plea to one count of submitting a false claim associated with her amended tax return for 2006, in violation of § 287. The Government elicited testimony concerning the circumstances underlying her guilty plea, including her submission of false Forms 1099-OID. Hesser claims that this testimony prejudiced him because it allowed the jury to conclude that his Forms 1099-OID were false by virtue of the fact that a court accepted Cheryl Hesser's admission that hers were.

The jury was adequately instructed at the close of evidence that "the fact that a witness has pled guilty to an offense is not evidence of the guilt of any other person." *See Countryman*, 758 F.2d at 577–78. Even in the absence of such a cautionary instruction, "the fact that a co-conspirator's guilty plea was made

32

known to the jury will rarely result in plain error." *United States v. Carrazana*, 921 F.2d 1557, 1568 (11th Cir. 1991). Furthermore, the prosecutor did not urge the jury to infer Hesser's guilt from his wife's guilty plea. *Cf. United States v. Deloach*, 34 F.3d 1004 (11th Cir. 1994) (per curiam). In short, the District Court did not commit plain error.

### E.

Hesser claims statements the prosecutor made during closing argument to the jury constituted prosecutorial misconduct.[29] To establish prosecutorial misconduct, Hesser must demonstrate that the prosecutor's remarks (1) were improper and (2) prejudicially affected his substantial rights. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

Hesser's first allegation of misconduct is that the prosecutor improperly vouched for the testimony of IRS employees during closing arguments. *See United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983) (per curiam). Impermissible vouching occurs when a prosecutor indicates his personal belief in a witness's credibility, either by "making explicit personal assurances" of the witness's

---

[29] Hesser did not object to any of the incidences of alleged prosecutorial misconduct. We therefore review the misconduct for plain error on the part of the District Court. In other words, Hesser's burden is to point to some controlling authority—a statute, rule, or binding precedent—that would have informed the District Court that it should interrupt the prosecutor's argument and give the jury a cautionary instruction because the argument, if permitted to stand, was likely to prejudice the defendant's substantial rights. *See* Fed. R. Civ. P. 52(b); *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) (per curiam).

33

veracity or "by indicating that information not presented to the jury supports the testimony." *Id.* Such comments must be viewed in the context of the entire trial. *United States v. Newton*, 44 F.3d 913, 921 (11th Cir. 1995).

Hesser argues that the prosecutor committed impermissible vouching when he stated that the IRS-employee witnesses "are the people that you work with. . . . All they're doing is honest, conservative, assessment of their job. . . ." This is not improper vouching. Viewed in the context of the entire trial, the prosecutor did not purport to personally guarantee the veracity of the statements of the Government's witnesses. Rather, the comments were part of his argument that the jury should not be persuaded by Hesser's claim that he acted in good faith. The prosecutor's remarks that the IRS employees "are the people that you work with" and who make "honest, conservative[] assessment[s]," viewed in context, were fair comments on evidence in the record regarding whether Hesser acted in good faith—specifically, that rather than cooperate with the IRS, Hesser sought out the counsel of tax-protestor groups and individuals. The remarks did not constitute error.

Hesser also argues that the prosecutor committed misconduct by misrepresenting evidence to the jury. *See United States v. Merrill*, 513 F.3d 1293, 1307 (11th Cir. 2008). Since he failed to object at trial, he is, in effect, arguing that this error was so egregious that the District Court should have intervened *sua*

34

*sponte* to remedy it.  *See Prieto*, 232 F.3d at 823.  He points to three alleged

misrepresentations.  First, the prosecutor stated that Hesser admitted that the

returns he submitted for 2005–2007 were false.  Hesser contends that he never

admitted this fact, and thus the prosecutor's statements regarding these supposed

admissions were prejudicial misrepresentations.  Second, Hesser takes issues with

the prosecutor's comment that he got his tax advice from "hustlers" rather than

legitimate tax professionals. Third, Hesser objects the prosecutor's assertions that

he relied on the advice of "disbarred attorneys."

   As explained above, Hesser did admit that his 2005–2007 returns were false.

And the prosecutor's characterization of the various tax protestors Hesser

consulted as "hustlers," though "colorful and perhaps flamboyant," was not

improper.  *See United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)

(quoting *United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992)).  But the

prosecutor's statement that Hesser relied on a "disbarred attorney[]," though

factually true, *see supra* note 3, was a misrepresentation of the record.[30]  This

attempted bootstrapping by the prosecutor *was* error.  *See Whittenburg v. Werner*

---

[30] The only reference to Hesser's reliance on a disbarred attorney, prior to closing argument, occurred in the following exchange:

[Prosecutor]. Isn't it true, sir, that Mr. Baxley has been disbarred?

[Hesser]. He -- all that I know is he retired.

[Prosecutor]. You were not aware that he was disbarred?

[Hesser]. No, I'm not aware of that.

35

*Enters. Inc.*, 561 F.3d 1122, 1128–29 (10th Cir. 2009) ("[T]he cardinal rule of closing argument[ is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence.").

But while we do not condone it, neither do we think that this isolated remark comes anywhere close to working such prejudice that Hesser's substantial rights were affected. Not only did the court instruct the jurors that lawyers' statements were not evidence, but the prosecutor himself emphasized to the jury that "the evidence doesn't come from this table," but rather "from the people who were sworn to tell the truth and the documents that are admitted into evidence." And of course, we presume that the jury follows instructions. This error is not so prejudicial that Hesser's convictions must fall.

## F.

Hesser next contends that even if none of the alleged errors he has asserted warrant reversal of his convictions, the cumulative effect of those errors deprived him of a fair trial. Under the cumulative-error doctrine, "an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (citation omitted).

36

Even weighed together, we cannot say that the errors he asserts affected his substantial rights.  First, from our review of the entire record, we are satisfied that the few errors we have identified did not impact the jury's verdicts.  As we have explained, the jury's note indicates that they were properly focused on the acts alleged in the indictment, not on the alternate potential bases Hesser urges on appeal.  And the prosecutor's brief comments about Hesser's reliance on a disbarred attorney, though improper, worked no substantial prejudice in light of the court's curative instruction.

Moreover, the evidence supporting Hesser's convictions was substantial.  As for the false claims convictions, Hesser himself testified that he requested refunds based not on withheld income tax, but on the basis of debt he had incurred.  And as for the tax evasion conviction, the Government put on unrebutted evidence of a tax deficiency and presented substantial circumstantial evidence that Hesser acted willfully to evade payment of that deficiency.

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one."  *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986).  We are satisfied that Hesser received a fair trial.

V.

Finally, we turn to two sentencing issues.  First, Hesser challenges the District Court's enhancement of his Guidelines sentence range via the application

37

of a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

Second, he challenges the statutory basis for the District Court's restitution order.

We review the District Court's findings of fact at sentencing for clear error, according special deference to the court's finding of witness credibility, *United States v. Amedeo*, 370 F.3d 1305, 1318 (11th Cir. 2004), and we give "due deference" to the court's application of the Sentencing Guidelines to the facts, 18 U.S.C. § 3741(e); *United States v. Williams*, 340 F.3d 1231, 1234–35 (11th Cir. 2003).  "[T]o permit meaningful appellate review, a district court applying the obstruction of justice enhancement must specifically state what the defendant did [and] why that conduct warranted the enhancement."  *United States v. Taylor*, 88 F.3d 938, 944 (11th Cir. 1996) (citing *United States v. Alpert*, 28 F.3d 1104 (11th Cir. 1994) (en banc)).  In the absence of such findings, we will remand unless "the record clearly reflects the basis for the enhancement and supports it."  *Id.*

A.

Section 3C 1.1 of the Sentencing Guidelines provides for a two-level enhancement

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

38

U.S.S.G. § 3C1.1.  Obstruction of justice includes willfully "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so," as well as "committing, suborning, or attempting to suborn perjury."  *Id.* cmt. n.4.

The Government requested the obstruction-of-justice enhancement because, it alleged, Hesser had both perjured himself while testifying and threatened his wife in an attempt to influence her testimony.  In its sentencing memorandum, the Government set out seventeen instances of Hesser's testimony it considered to be perjurious.  The District Court rejected most of the Government's contentions on the grounds that the selected portions of Hesser's testimony were not false or material.  It imposed the § 3C1.1 enhancement on the basis of three statements it found constituted perjury, as well as on the basis of Hesser's course of conduct in attempting to influence his wife's testimony.  We need look no further than the latter ground which suffices to support the enhancement.

The pertinent course of conduct, which was described in the Government's sentencing memorandum, concerned events that occurred in the month leading up to Hesser's trial, when he discovered that his wife would be testifying for the Government and that she had given the Government documents for use in his prosecution.  The District Court considered two separate occasions on which Hesser attempted to influence his wife's testimony.

39

The first portion of testimony the court considered concerned a conversation between Hesser and his wife that occurred approximately three and a half weeks before the trial. Cheryl Hesser testified that she and Hesser were driving home from church when Hesser asked her to "go over the story line" of her upcoming testimony with him. She told him she would not go over the testimony because she planned to tell only the truth at trial. The Government asked her, "Did Mr. Hesser, your husband of 15 years, person you got arrested with, person whose idea this was say, if you don't want to help, I'll know whose head to lop off?" She responded, "I'll know whose head to chop off, yes."

The second series of events the court considered began when the Government asked Hesser to describe the circumstances that, approximately a week and a half before trial, led police to remove Cheryl Hesser and her children from the Hessers' home to a secure location. Hesser had confronted his wife about her giving documents to the Government, following which Cheryl Hesser called her attorney and told him that Hesser was intimidating her. It appears that her attorney, in turn, called the police. In the meantime, Hesser took the couple's two eldest children into a bedroom and told them that their mother was betraying him by working with the Government. Cheryl Hesser testified at trial that these events were attempts to intimidate her so that she would change her testimony. Hesser,

40

by contrast, contends that the events were merely an "intra-family dispute and tug-of-war for [the] children."[31]

The District Court credited Cheryl Hesser's testimony concerning these events over that of her husband, and it found that "the [g]overnment has established that the conduct as described by Mrs. Hesser constitutes an obstruction of justice." We cannot say the District Court committed clear error in crediting Cheryl Hesser's testimony over that of her husband. *See Amedeo*, 370 F.3d at 1318. And though it did not make specific findings about why Hesser's conduct warranted the obstruction-of-justice enhancement, the basis for its determination is apparent in the record. *See Taylor*, 88 F.3d at 944. Cheryl Hesser's testimony establishes conduct that meets the Guidelines' definition of obstructive conduct: Hesser's attempt to "go over the story line" of his wife's testimony constitutes unlawful interference with a witness's testimony; his threat to harm his wife if she testified truthfully constitutes threatening a witness; and the manner of his confrontation with her about giving documents to the Government constitutes witness intimidation. *See* U.S.S.G. § 3C1.1 cmt. n.4(A). Though the District

---

[31] Hesser argues on appeal that, had the District Court not denied his attempt during the sentencing hearing to more fully develop the record concerning the history of his marriage, the court would have realized that he did not act with the intent to obstruct justice. This characterization of this supposed attempt to develop the record during the sentencing hearing is without basis in fact. At the hearing, Hesser's attorney proffered evidence that purportedly would have impeached Cheryl Hesser's testimony that she filed for divorce from Hesser in 2002 because he was an angry man. The District Court did not err in ruling that this evidence was irrelevant to the issue of whether Hesser had obstructed justice.

Court did not make explicit its finding that Hesser acted willfully with the intent to obstruct the prosecution, "the record clearly reflects the basis for the enhancement and supports it." *Taylor*, 88 F.3d at 944.  Consequently, we hold that the District Court did not err in applying the § 3C1.1 enhancement.

### B.

The District Court ordered Hesser to pay restitution to the IRS in the amount of $296,246.  In his 2007 tax return, he claimed that such amount had been withheld for income taxes he would owe for that year.  Under 18 U.S.C. §§ 3663 and 3663A, however, a district court is only authorized to order restitution in the amount of the actual losses the defendant causes in committing a Title 18 offense (and offenses under other titles not relevant here).  *United States v. Nolen*, 472 F.3d 362, 382 (5th Cir. 2006); *United States v. Campbell*, 106 F.3d 64, 69–70 (5th Cir. 1997); *see also United States v. Baggett*, 459 F. App'x 886, 887 (11th Cir. 2012) (per curiam).  After the IRS discovered the falsity of Hesser's 2007 return, it re-imposed the tax liens associated with his deficiencies for 2001–2003, thus limiting the losses caused as a result of Hesser's false filings for 2005–2007 (i.e., the Title 18 offenses) to $123,495.18, the amount of the refund check Hesser drew against IRS's accounts.

Although Hesser still owes the Government money in the amounts of his 2001–2003 deficiencies, the Government conceded at oral argument that such

42

amounts do not constitute actual losses caused by conduct underlying a Title 18 offense and that a remand is in order so that the District Court can determine the proper amount of restitution.

## VI.

In conclusion, we AFFIRM Hesser's convictions, prison sentences, and supervised release.  We VACATE, however, the District Court's restitution order and REMAND for further proceedings as to restitution.

SO ORDERED.