[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 14-11699 & 15-12697
_____

D.C. Docket No. 1:08-cr-21158-RNS-4


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY LIVOTI,

Defendant-Appellant.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(October 4, 2018)

Before WILLIAM PRYOR, Circuit Judge, and RESTANI,[*] Judge.

PER CURIAM:[**]

_____

[*] Honorable Jane A. Restani, United States Judge for the Court of International Trade, sitting by designation.
[**] After oral argument, Judge Jill Pryor recused herself and did not participate in this decision, which is rendered by a quorum. 28 U.S.C. § 46(d).

Anthony Livoti appeals his convictions for mail fraud, 18 U.S.C. § 1341; conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; and conspiracy to commit money laundering, 18 U.S.C. § 1956(h). Livoti served as trustee for Mutual Benefits Corporation, which operated a scheme to defraud thousands of investors who purchased its viatical investments. As trustee, Livoti was responsible for safeguarding investors' money. But Livoti took money from new investors to pay for premiums of old investors. Although Livoti knew that Mutual Benefits was running a deficit, he continued to assure investors that Mutual Benefits was a safe investment. After an 11-week trial, the jury convicted Livoti for his involvement in the fraudulent scheme at Mutual Benefits. Livoti argues that the government presented insufficient evidence to support his convictions. He also challenges several evidentiary rulings and contends that the government improperly bolstered the credibility of one of its witnesses. And Livoti argues that the district court erred when it denied his motion for a new trial based on juror misconduct. These arguments fail. We affirm.

## I. BACKGROUND

Mutual Benefits was a viatical investment company in Fort Lauderdale, Florida, owned by Joel Steinger, Leslie Steinger, Steven Steiner, and Peter Lombardi. A viatical is an investment in which the insured, usually an elderly or terminally ill person, sells his life-insurance policy to an investor. The investor

2

then pays the premiums for the policy so long as the insured lives, and the investor profits if the amount he invests is less than the payout he receives when the insured dies. Mutual Benefits bought viaticals and then sold fractional shares of those viaticals to other investors. Mutual Benefits was responsible for paying premiums on the policies.

Livoti, an attorney, served as the premiums trustee for Mutual Benefits. Investors signed trust agreements that made Livoti the owner of the viatical policies and made the investors irrevocable beneficiaries of the policies. As trustee, Livoti was a fiduciary of the investors. He was obligated to represent the investors' best interests, to protect the premium money, and to use the premium money in accordance with the trust agreements.

Mutual Benefits assured investors that its viaticals were safe and profitable investments. Lombardi explained that Mutual Benefits marketed itself as a "no risk investment" with "total fixed returns." To prove that its viaticals were safe investments, employees told investors and sales brokers that Mutual Benefits used independent physicians to project the life expectancies of the insureds. Because the owner of the policy owed premiums as long as the insured lived, an investor would use the physician's projection to measure how safe that viatical would be as an investment. If an insured lived longer than expected, an investor would lose money

3

because the total amount invested in that viatical—the purchase price plus the premiums—would exceed the insurance benefit.

Although Mutual Benefits touted its projections as 80 percent accurate, Joel Steinger fabricated projections for whatever life expectancy an investor wanted. He then sent the fake projections to a so-called "independent" physician, who endorsed them. Indeed, these fake projections were not even completed before an investor agreed to buy a policy. Mutual Benefits then backdated the physician's signature.

Unsurprisingly, Joel Steinger's fake projections underestimated the life expectancies of the insureds. About 80 percent of the insureds outlived their projected life expectancies. But Mutual Benefits had to pay premiums as long as those insureds lived. If Mutual Benefits failed to pay premiums for a policy, the insurance company could cancel that policy, and the viatical would become worthless. And the fake projections meant that there was never enough money set aside to pay premiums as they were due. On paper, Mutual Benefits looked like a safe investment, but in fact it was a Ponzi scheme.

As money was running out, Livoti tried to keep Mutual Benefits afloat by using money from new investors to pay premiums for policies owned by old investors. Because Mutual Benefits never had enough money, Lombardi explained that they "were always playing catch up." But the trust agreements did not permit

4

Livoti to use one investor's money to pay another investor's premiums except in a few circumstances. For example, if an insured died before his projected life expectancy, Livoti could use any remaining money for that policy to pay other investors' premiums. And Livoti could use a limited pool of reserve funds to pay premiums for a policy that had exhausted its reserves. Absent those narrow circumstances, Livoti was not permitted to use money from new investors to pay premiums of old investors.

Livoti knew that Mutual Benefits did not have enough money in its account to pay premiums for each policy. Ameer Khan served as president of Viatical Services Inc., a separate entity that tracked the policies sold by Mutual Benefits and notified Mutual Benefits when premiums were due. On several occasions, Khan discussed his concerns about the deficit in the account with Livoti, and he showed Livoti reports of the deficit. Khan explained to Livoti that insureds outliving their projections had caused a "total drain" of the account. After about six of these conversations, Khan told Livoti that "it is going down," and Livoti finally "started taking things seriously." In addition to his discussions with Khan, Livoti discussed the deficit with Lombardi, an owner of Mutual Benefits, and Michael McNerney, an outside attorney for Mutual Benefits.

Harris Solomon, another outside attorney for Mutual Benefits, reviewed Livoti's management of the account and told Livoti that intentionally "using one

investor's money to pay for another investor's obligation" might be a crime. Solomon's review revealed that money from one investor had been used to pay another investor's premiums. Solomon told Livoti to open a separate account for new investors' money and to stop using the money from new investors to pay for premiums of old investors. But Solomon never finished his review because McNerney told him that someone else would complete it.

Despite these warnings, Livoti continued to use money from new investors to pay old investors' premiums. Livoti followed Solomon's advice by opening a separate account for money from new investors. But Livoti continued to use that money to pay for old investors' premiums. And Livoti admitted that he freely transferred money—almost $6 million—from the new investor account to pay for old investors' premiums.

Despite his knowledge to the contrary, Livoti continued to assure investors that Mutual Benefits had more than enough money to pay premiums on the policies. He requested bank statements to show investors that the accounts had $20 million. But these bank statements were misleading because Mutual Benefits was in fact running a deficit because of the large amount of premiums due. Livoti also assured investors that he was a neutral trustee. Yet Livoti participated in promotional tours, spoke at monthly sales seminars, and appeared in marketing videos for Mutual Benefits. At one promotional tour, Livoti "boasted" that Mutual

6

Benefits had "plenty of money" and could pay premiums "just based off the interest."

Livoti also engaged in fraudulent gift assignments. Mutual Benefits bought some policies that contained no-value restrictions. If a policy had a no-value restriction, it could be transferred only as a gift, not for any value. To avoid this restriction, Mutual Benefits would assign that policy as a "gift" to "Anthony M. Livoti, Jr.," the individual—instead of "Anthony M. Livoti, Jr., P.A.," the corporate entity. Then, Livoti would sign a letter sent to the insurance company that designated Mutual Benefits investors as his beneficiaries on that policy. Livoti represented to the insurance company that the investors were his "friends."

Mutual Benefits concealed the fraudulent gift assignments by maintaining the "Livoti line," a special phone number that allowed employees to communicate with an insurance company without revealing that Mutual Benefits owned that policy. If an insurance company called the Livoti line, the employees would answer the call as Livoti's "law office" instead of "Mutual Benefits." Livoti listed the number for the Livoti line in letters sent to insurance companies. Mutual Benefits had to conceal the fraudulent gift assignments because those policies could be voided if the fraud was discovered.

In May 2004, the Securities and Exchange Commission filed a complaint against Mutual Benefits and some of its employees in the district court. Livoti was

7

not named as a defendant in that civil proceeding, but he was deposed. The Commission alleged that Mutual Benefits committed securities fraud through its operation of a Ponzi scheme. The district court issued a preliminary injunction followed later by a permanent injunction. The district court also appointed a receiver to oversee the disposition of the assets left at Mutual Benefits. By the time Mutual Benefits was shut down, it owned over 8,000 policies.

At trial, the government introduced evidence of Livoti's role in the fraudulent scheme at Mutual Benefits. The government called Alise Johnson, an attorney who prosecuted the Commission's civil action against Mutual Benefits and deposed Livoti. She testified about the Commission's allegations of the scheme and the outcome of the civil proceeding. She also discussed her deposition of Livoti for that proceeding.

The government also called Lombardi, who cooperated with the prosecution of Livoti and others involved in the scheme at Mutual Benefits. Lombardi discussed his prior testimony in the trial of Steven Steiner. And he discussed his cooperation with the government in the investigation of several other cohorts.

The government called several witnesses who pleaded guilty to crimes associated with the fraudulent scheme at Mutual Benefits. Khan testified about the circumstances surrounding his guilty plea and the substance of that plea. Khan also referenced the guilty pleas of Steven Ziegler, an outside attorney for Mutual

8

Benefits, and Raquel Kohler, an employee of Mutual Benefits. The jury also heard about the guilty pleas of McNerney and Bari Wiggins, an administrative assistant of Mutual Benefits. The district court gave limiting instructions contemporaneously with the admission of each guilty plea and at closing instructions.

In defense, Livoti argued that, although Mutual Benefits was ridden with fraud, he was not part of the fraud and was "kept in the dark." In his opening statement, Livoti's counsel used an organizational chart to tell the jury that almost all of his cohorts at Mutual Benefits pleaded guilty. But "[o]ff to the right a[t] that lonely end . . . is Tony Livoti," and Livoti was "not part of the business or decision-making model" for Mutual Benefits. Thus, the defense strategy was "to prosecut[e] Mutual Benefits to exonerate Tony Livoti." That strategy failed.

The jury convicted Livoti of two counts of mail fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering. The district court sentenced Livoti to 120 months of imprisonment and three years of supervised release. The district court also ordered Livoti to pay a special assessment of $400 and restitution of $826,839,642, owed jointly and severally.

While Livoti's appeal was pending, the district court informed the parties that it discovered that Juror J.D. mistakenly responded to a jury summons for his father. Juror J.D. shared the same name and address as his father. The district court

9

explained that "everyone, including Juror J.D.," failed to realize the mistake before the trial. Juror J.D. truthfully completed his juror questionnaire and truthfully answered questions during voir dire. The district court informed the parties out of an abundance of caution, but it concluded that further action was unnecessary.

Livoti immediately moved for a new trial based on juror misconduct, but the district court denied his motion. The district court explained that Livoti could not obtain a new trial based on juror misconduct because he could not prove that Juror J.D. was motivated by actual bias. It decided that no evidentiary hearing on the motion was necessary because Livoti's request was "speculative and unsubstantiated" because he did not allege "any misconduct, only an honest, non-prejudicial mistake."

## II. DISCUSSION

We divide our discussion in several parts. First, we explain that sufficient evidence supported Livoti's convictions. Next, we explain that that district court did not plainly err when it permitted testimony about the civil proceeding against Mutual Benefits. We then explain that the district court did not plainly err when it permitted testimony about the guilty pleas of Livoti's cohorts. We next explain the government did not improperly bolster its witness's testimony. Finally, we explain that the district court did not abuse its discretion when, without an evidentiary hearing, it denied Livoti's motion for a new trial.

10

### A.   Sufficient Evidence Supported Livoti's Convictions.

Livoti challenges the sufficiency of the evidence for his convictions for mail fraud, 18 U.S.C. § 1341; conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; and conspiracy to commit money laundering, 18 U.S.C. § 1956(h). We review the sufficiency of the evidence *de novo*. *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). But we must "resolve any conflicts in favor of the [g]overnment, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all credibility choices in support of the verdict." *Id.* The evidence is sufficient if "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996)). And "we will not disturb a guilty verdict unless, given the evidence in the record, 'no trier of fact could have found guilt beyond a reasonable doubt.'" *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir. 2005) (quoting *United States v. Lyons*, 53 F.3d 1198, 1202 (11th Cir. 1995)).

To establish mail or wire fraud, the government must prove (1) that the defendant "intentional[ly] participat[ed] in a scheme to defraud," and (2) that he used "the interstate mails or wires in furtherance of that scheme." *Maxwell*, 579 F.3d at 1299. To establish a conspiracy to commit mail fraud, wire fraud, or money laundering, "the government must prove that an agreement existed between two or

11

more persons to commit a crime and that the defendant knowingly and voluntarily joined or participated in the conspiracy." *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983). As at his trial, Livoti does not dispute on appeal that a fraudulent scheme existed at Mutual Benefits. Instead, Livoti argues that the evidence was insufficient to prove that he knowingly joined that scheme or that he intended to defraud investors. We disagree.

Livoti contends that the government's evidence was "tenuously circumstantial," but "we draw no distinction between circumstantial and direct evidence." *Silvestri*, 409 F.3d at 1328. The government may present circumstantial evidence to prove both a defendant's knowledge of a scheme, *see Maxwell*, 579 F.3d at 1299, and his intent to defraud, *see United States v. Hawkins*, 905 F.2d 1489, 1496 (11th Cir. 1990). To prove that the defendant knew of a fraudulent scheme, the government need prove only "that the defendant knew the essential object of the conspiracy." *Silvestri*, 409 F.3d at 1328 (citation and quotation marks omitted). The government need not prove that the defendant knew of every aspect of the fraudulent scheme. *Id.* at 1329. And to prove that the defendant intended to defraud, the government need prove only that the defendant "believed that he could deceive the person to whom he made the material misrepresentation out of money or property of some value." *Maxwell*, 579 F.3d at 1301 (citation and quotation marks omitted). The jury may infer the defendant's intent to defraud from his

12

conduct, *see id.*, or from the existence of the scheme, *see United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

Livoti argues that nothing in the government's evidence "pointed strongly to [his] guilty knowledge and intent," but we disagree. Livoti knew that Mutual Benefits "was hemorrhaging money and unable to sustain its operations without a constant influx of investment capital." *United States v. Edwards*, 526 F.3d 747, 756 (11th Cir. 2008) (internal quotation marks omitted). The deficit in the premium account was well known within Mutual Benefits, and Livoti knew about it. Lombardi testified that he discussed the deficit with Livoti and that Livoti was "very concerned that the money was running out." Khan showed Livoti reports that reflected the deficit. When Livoti saw the reports, Khan told him "it is going down." The deficit was caused by the insureds outliving their projected life expectancies. And Livoti knew that almost 80 percent of the insureds outlived their projections. Not only did the government prove that Livoti knew of the deficit, but it also proved that Livoti was warned the scheme was unlawful. Sufficient evidence established that Livoti knew of the fraudulent scheme.

Sufficient evidence also established that Livoti intended to defraud investors. Although Livoti portrayed himself as a neutral trustee, he "courted . . . investors with assurances that [Mutual Benefits] was financially sound and profitable." *Edwards*, 526 F.3d at 756 (internal quotation marks

13

omitted). Livoti spoke at Mutual Benefits sales seminars and participated in the promotional tours. Livoti even appeared in a Mutual Benefits marketing video.

Despite his fiduciary duties as a trustee, Livoti continued to mislead investors. Livoti contends that he made no misrepresentations to investors, but the evidence proved otherwise. Livoti assured investors that Mutual Benefits could pay the premiums. And as proof, Livoti showed bank statements to the investors. But those bank statements were misleading because Mutual Benefits was in fact running a deficit because of the large amount of premiums due.

The government was not required to prove Livoti knew every aspect of the fraudulent scheme at Mutual Benefits. So long as Livoti knew at least one aspect of the scheme was fraudulent, the jury could reasonably infer that Livoti "knew other aspects of the scheme were similarly fraudulent." *Silvestri*, 409 F.3d at 1329. The government satisfied its burden.

The government proved that Livoti knew that the gift assignments to investors as his "friends" were fraudulent. Livoti "personally played a significant role," *id.* at 1331, in the gift assignments. Indeed, he was the linchpin of that aspect of the fraudulent scheme.

When Mutual Benefits bought a policy with a no-value restriction, that policy was put in Livoti's individual name, "Anthony M. Livoti, Jr.," as a gift assignment to deceive the insurance company. In fact, Mutual Benefits bought that

14

policy to sell to investors as a viatical. Mutual Benefits did not use Livoti's name while keeping him in the dark. Livoti signed documents either in his individual name as "Anthony M. Livoti, Jr.," or in his corporate status as "Anthony M. Livoti, Jr., P.A." Livoti knew the difference between those two signatures. For example, Livoti identified errors when documents incorrectly listed "P.A."

When Livoti signed a letter in his individual name, he represented to the insurance company that he had received that policy as a gift, and he would then designate Mutual Benefits investors as his beneficiaries labeled as his "friends." Livoti contends that the "nominal use of the term 'friend' in the formal assignment of some policies to the care of Livoti is not foreign to the role of lawyer.'" Someone might call a lawyer his friend, but Livoti was certainly not a friend to the thousands of investors to whom he assigned the policies as a "gift."

Livoti knew the gift assignments were a lie. The gift assignments carried substantial risks for investors because an insurance company could void a policy if it discovered a fraudulent gift assignment. Yet Livoti never disclosed these risks to investors.

The jury could also infer that Livoti knew the gift assignments were fraudulent from the elaborate measures taken to conceal them. Mutual Benefits used a special phone line—the "Livoti line"—to deceive insurance companies. When the Livoti line rang, Mutual Benefits employees answered as if the insurance

15

company had reached Livoti's law firm. Livoti argues that he thought the Livoti line was only for administrative purposes. But the government presented evidence that proves he understood the nature of the Livoti line. And Livoti used special letterhead that listed the Livoti line as his phone number. "Plainly, the jury was free to choose among reasonable interpretations of the testimony," *Silvestri*, 409 F.3d at 1330, and it was reasonable for the jury to infer that Livoti both knew of the fraudulent scheme and intended to defraud investors.

Finally, Livoti argues that the government's evidence "was inconsistent with financial realities" because Livoti was not paid "outrageous sums of money" like others involved in the fraudulent scheme. To be sure, others made $15 million each from the scheme, while Livoti made only $980,000. But the jury could still find that Livoti made that substantial amount of money by intentionally defrauding innocent investors and insurance companies. And the evidence need not "be inconsistent with *every* reasonable hypothesis except that of guilt in order to be sufficient." *Id.* at 1328. The "financial realities" may be consistent with Livoti's innocence, but we cannot second-guess another reasonable interpretation of the evidence—that he was guilty.

### B. *The District Court Did Not Plainly Err when It Permitted Testimony About the Civil Proceeding Against Mutual Benefits.*

The government called Johnson, a Commission attorney, to testify about Livoti's deposition in the civil proceeding against Mutual Benefits and some of its

16

employees. She also testified that the Commission obtained a preliminary and later a permanent injunction against Mutual Benefits to stop the fraudulent scheme. Johnson explained that a receiver took over Mutual Benefits and reviewed Livoti's handling of the premium accounts.

Livoti contends that Johnson's testimony violated the Federal Rules of Evidence and his rights under the Fifth and Sixth Amendments. But he failed to raise any objections to Johnson's testimony at trial, so we review for plain error. Fed. R. Crim. P. 52(b); *Puckett v. United States*, 556 U.S. 129, 135 (2009). "To find plain error, there must be: (1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights." *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015) (quoting *United States v. Khan*, 794 F.3d 1288, 1300 (11th Cir. 2015)).

Livoti argues that Johnson's testimony violated the Federal Rules of Evidence because it was inadmissible hearsay, irrelevant, and unduly prejudicial, but we reject these arguments because the district court committed no error. Although factual findings and orders from prior proceedings are hearsay, *see United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994), the government did not introduce the preliminary or permanent injunctions from the civil proceeding. Instead, the government elicited testimony about those injunctions from Johnson based on her personal knowledge. Johnson's testimony was not hearsay because

17

she made the statements "while testifying at the current trial." Fed. R. Evid. 801(c). The testimony about the civil proceeding against Mutual Benefits was also relevant to Livoti's guilt. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and that "fact is of consequence in determining the action." Fed. R. Evid. 401. Johnson's testimony about a fraudulent scheme at Mutual Benefits has a tendency to make the fact that Livoti conspired and participated in a fraudulent scheme more probable than it would be without that testimony. The very reason for Livoti's trial was to determine whether Livoti was part of that scheme. And the testimony about the receiver's review of how Livoti handled the accounts was also relevant because it was part of the story of Livoti's role in the scheme.

We cannot say that the district court committed any error, plain or otherwise, when it did not exclude Johnson's testimony under Federal Rule of Evidence 403. A district court may exclude relevant evidence when "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Rule 403 "involves [a] balancing" of the evidence. *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1287 (11th Cir. 2001). And our review "look[s] at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Jernagin*, 341 F.3d 1273, 1284 (11th Cir. 2003) (citation and internal quotation marks omitted). To be

18

sure, we have held that "[j]udicial findings of fact," like Johnson's testimony about the findings in the civil proceeding, "present a rare case where, by virtue of their having been made by a judge, . . . would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice." *U.S. Steel*, 261 F.3d at 1287. But in the light of Livoti's defense strategy, we are not convinced that the district court struck the wrong balance.

As early as his opening statement, Livoti's counsel encouraged the jury to find that, although others at Mutual Benefits had pleaded guilty, Livoti was not part of their fraudulent scheme. The jury "heard from the government what the [fraudulent] business of Mutual Benefits was," but Livoti "d[id]n't challenge that." Throughout the trial, Livoti stuck with this strategy and routinely relied on the civil proceeding to prove that Livoti was not part of that scheme. For example, Livoti's counsel asked Johnson if she "would agree that if [she] had reason to believe Mr. Livoti was looting the company he would have been named as a defendant in the [civil proceeding]." Livoti's counsel also elicited testimony from Johnson about Livoti's cooperation with the receiver, the contents of the receiver's report, and other depositions taken during the civil proceeding. The danger of unfair prejudice from Johnson's testimony was not substantially outweighed by its probative value, particularly because Livoti too relied on the probative value of this testimony.

19

Next, Livoti argues that Johnson's testimony compromised his Fifth Amendment right to remain silent and his Sixth Amendment right to a jury trial. To support these arguments, Livoti restates why the testimony about the civil proceeding was prejudicial, but again no error occurred. Even without Johnson's testimony, it was no secret to the jury that others at Mutual Benefits pleaded guilty to the fraudulent scheme because Livoti proclaimed their guilt from the outset. Johnson's testimony caused no deprivation of Livoti's rights under the Fifth and Sixth Amendments.

After the jury heard that others at Mutual Benefits pleaded guilty for a fraudulent scheme, Livoti now asks, "What more was left for the jury to decide?" That answer is clear: What the jury had left to decide was whether *Livoti* participated in that fraudulent scheme. And when the jury made that decision, it could consider Johnson's testimony about the earlier civil proceeding. The district court committed no error, plain or otherwise, when it permitted Johnson's testimony.

### C. The District Court Did Not Plainly Err when It Permitted Testimony About the Guilty Pleas of Livoti's Cohorts.

Livoti argues that the district court erred when it allowed the government to use the guilty pleas of his cohorts as substantive evidence of his guilt. When the government called Khan, McNerney, and Wiggins, the jury heard testimony about the circumstances underlying each of their guilty pleas that included specific

20

statements made as part of the plea. Khan's testimony also referenced the guilty

pleas of Ziegler and Kohler, who were both later called as witnesses by Livoti.

Livoti did not preserve any objections for the specific challenge he now makes, so

we review only for plain error. *United States v. Straub*, 508 F.3d 1003, 1011 (11th

Cir. 2007).

To be sure, a cohort's guilty plea may not be used as substantive evidence of

a defendant's guilt, *United States v. King*, 505 F.2d 602, 607 (5th Cir. 1974), but a

cohort's guilty plea may be used for other purposes. "Either the [g]overnment or

the defense may elicit evidence of a [cohort's] guilty plea or conviction to aid the

jury in assessing the [cohort's] credibility." *United States v. DeLoach*, 34 F.3d

1001, 1004 (11th Cir. 1994). To determine whether a guilty plea was used for a

proper purpose, we consider several factors. *King*, 505 F.2d at 607. These factors

include the presence of a jury instruction, the purpose of introducing the guilty

plea, how the guilty plea was used, whether the defendant invited the introduction

of the guilty plea, whether the defendant objected or requested an instruction, and

whether the defendant's failure to object was a tactical consideration. *Id.* at 608.

Livoti's challenge to the use of his cohorts' guilty pleas fails for three

reasons. First, the government did not use the cohorts' guilty pleas as substantive

evidence of Livoti's guilt. We have ruled that the government may disclose guilty

pleas of its witnesses to "blunt the impact of expected attacks on the witnesses'

21

credibility." *DeLoach*, 34 F.3d at 1004 (quoting *United States v. Countryman*, 758 F.2d 574, 577 (11th Cir. 1985)). The government anticipated that Livoti would attack his cohorts' credibility and introduced their guilty pleas to blunt the impact of those attacks. And Livoti did attack his cohorts' credibility with their guilty pleas. For example, Livoti suggested that Wiggin's testimony could not be trusted because she had pleaded guilty and wanted favorable treatment from the government.

Even if the district court committed error when it permitted testimony about the guilty pleas of Ziegler and Kohler, it was not plain error because Livoti's substantial rights were not affected. *See Hesser*, 800 F.3d at 1325. Although "[t]he admission of guilty pleas or convictions of [cohorts] not subject to cross-examination is generally considered plain error," *United States v. De La Vega*, 913 F.2d 861, 866 (11th Cir. 1990), the testimony about Ziegler's and Kohler's guilty pleas was not "patently improper, after considering the facts and circumstances of this incident in its proper context," *id.* at 867. Neither Ziegler nor Kohler had testified when the government elicited testimony about their guilty pleas, so the government could not anticipate attacks on their credibility. But "there is no reasonable probability of a different result absent the error" because the jury learned about their guilty pleas from Livoti's counsel during his opening statement.

22

*Hesser*, 800 F.3d at 1325. And Ziegler and Kohler were eventually called as witnesses by Livoti, and he questioned them about their guilty pleas.

The government never used the guilty pleas of Livoti's cohorts as substantive evidence of Livoti's guilt. Nor did the government's reference to specific statements made as part of the guilty pleas cross the line into substantive evidence of Livoti's guilt. We have found no plain error when the government "elicited testimony concerning the circumstances underlying [the witness's] guilty plea." *Hesser*, 800 F.3d at 1328. The district court did not plainly err when it allowed testimony on the specific statements made as part of the guilty pleas.

Second, the jury was instructed not to use the cohorts' guilty pleas as substantive evidence of Livoti's guilt. Unless aggravated circumstances exist, "a cautionary instruction directing the jury not to consider a guilty plea as substantive evidence of guilt will sufficiently cure any potential for prejudice to the defendant on trial." *United States v. Carrazana*, 921 F.2d 1557, 1568 (11th Cir. 1991). We presume that the jury follows the instructions given by the district court. *United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2001). And we have "emphasized that cautionary instructions by the trial court are both essential and effective in avoiding prejudice where the fact of a coconspirator's guilty plea is brought out at a trial before a jury." *King*, 505 F.2d at 607.

23

The district court instructed Livoti's jury both contemporaneously with the introduction of the guilty pleas and during the final charge. During Khan's testimony about his guilty plea, the district court instructed the jury that "a witness'[s] plea of guilty to the same or similar or even a related crime is not evidence of this defendant's guilt." And the district court instructed the jury to consider the witness's guilty plea "solely for the purpose of evaluating this witness's believability[,] . . . not [as] evidence that this defendant participated in that." The district court gave virtually identical instructions contemporaneously with the testimony about Wiggin's and McNerney's guilty pleas. During the final charge, the district court instructed the jury that "the fact that a witness has pleaded guilty to an offense is not evidence of the guilty of any other person." Because the district court correctly instructed the jury, "[t]he law requires nothing more." *DeLoach*, 34 F.3d at 1005.

Third, Livoti invited the testimony about the guilty pleas. A defendant who "opened the door by first inviting the [g]overnment to introduce the evidence of [the witness's] plea" waives his challenge to the introduction of that plea. *King*, 505 F.2d at 608–09. After a defendant injects a witness's guilty plea in a case, the government is not required to ignore that guilty plea. *See id.* at 608. For example, in *DeLoach*, the defendant invited the testimony about the witness's guilty plea when "[b]eginning with its opening statement and throughout the [g]overnment's

24

case, DeLoach sought to shift culpability to [the witness] and to portray him as the real culprit." *DeLoach*, 34 F.3d at 1005. We will not protect a defendant from his "deliberate tactical decision[s]." *Carrazana*, 921 F.2d at 1568.

Livoti's defense strategy "sought to shift culpability" to his cohorts at Mutual Benefits who had pleaded guilty by "portray[ing] [them] as the real culprit[s]." *DeLoach*, 34 F.3d at 1004. From the beginning of the trial, Livoti argued that, although others at Mutual Benefits pleaded guilty to running a fraudulent scheme, Livoti was not part of that scheme. In his opening statement, Livoti's counsel listed the names of those who had pleaded guilty. And he explained that "many of the government's witnesses will acknowledge . . . that they themselves have committed crimes, . . . and now here today they're testifying in the hopes of getting some benefit." Livoti's opening statement made "it almost essential for the prosecution to bring out [the guilty pleas] on direct examination." *King*, 505 F.2d at 608.

Throughout the trial, Livoti used the guilty pleas to imply that his cohorts were guilty, but he was not. Livoti elicited testimony about the guilty pleas throughout his cross-examinations of Khan and Wiggins. And it was Livoti, not the government, who called McNerney as a witness and first elicited testimony about his guilty plea. Livoti made "deliberate tactical decision[s]," *Carrazana*, 921 F.2d at 1568, that "heavily relie[d] on the guilty pleas with 'frequent, pointed, and direct

references,'" *United States v. Setser*, 568 F.3d 482, 494 (5th Cir. 2009). Livoti

cannot complain now about the proper use of those guilty pleas by the government.

### D. The District Court Did Not Plainly Err Because the Government Did Not Bolster Lombardi's Testimony.

Livoti argues that the government bolstered Lombardi's credibility by asking

about his cooperation with the government in other proceedings against Mutual

Benefits employees. And he argues this "bolstering" invited the jury to believe

Lombardi's testimony simply because the other juries had believed his prior

testimony. After Lombardi testified, Livoti equivocated but eventually stated, "I

guess I have an objection," which the district court promptly overruled. We need

not decide if this objection preserved the issue for appeal because we conclude the

district court committed no error.

It is improper for the government to bolster its witness's testimony. *United*

*States v. Sosa*, 777 F.3d 1279, 1295 (11th Cir. 2015). Bolstering occurs when the

government "vouch[es] for that witness's credibility." *Id.* (quoting *United States v.*

*Bernal-Benitez*, 594 F.3d 1303, 1313 (11th Cir. 2010)). The government cannot

"plac[e] the prestige of the government behind the witness" nor can it "indicat[e]

that information not before the jury supports the witness's credibility." *Id.*

But there are exceptions to this general rule. The "fair response" exception

"entitles a prosecutor to respond to arguments advanced by defense counsel in his

or her statement to the jury." *Id.* at 1295 (quoting *United States v. Lopez*, 590 F.3d

1238, 1256 (11th Cir. 2009)). For example, the government may rehabilitate its witness when a defendant attacks that witness's credibility. *See United States v. Cano*, 289 F.3d 1354, 1366 (11th Cir. 2002). The rule against bolstering does not prohibit the government from "commenting on a witness's credibility, which can be central to the government's case." *Id.* To determine whether the rule against bolstering was violated, we do not isolate the challenged testimony, but instead, we look at that testimony in its context. *See Sosa*, 777 F.3d at 1296. Put differently, the rule against bolstering does not apply "in a vacuum." *Bernal-Benitez*, 594 F.3d at 1314.

Livoti argues that the government bolstered Lombardi's credibility by repeatedly asking how his prior testimony fared in the criminal trial of Steven Steiner and with regard to 11 or 12 other employees of Mutual Benefits. Yet during his cross-examination of Lombardi, Livoti's counsel asked about the results of the other proceedings in which Lombardi had cooperated with the government. He asked in detail about Steiner's trial and had Lombardi agree that Steiner's indictment did not involve the same charges as Livoti's trial. And Livoti suggested that the jury should not believe Lombardi's testimony because Lombardi had not yet "gotten [his] payday" from the government—a reduction in his sentence that "only the [g]overnment" could ask for.

27

The government was permitted a fair response, and it made a fair response. After Lombardi testified that Steiner's indictment did not involve the same charges as Livoti's trial, the government had Lombardi clarify, on redirect examination, that his testimony against Steiner did concern the fraudulent scheme at Mutual Benefits. And Lombardi again confirmed that Steiner and 11 or 12 others had already been held accountable for that fraudulent scheme. And after Livoti suggested that Lombardi was not credible because he had yet to receive his "payday," the government had Lombardi clarify that his prior testimony resulted in Steiner and 11 or 12 others being held accountable for the fraudulent scheme at Mutual Benefits. In response to Livoti's attacks, the government was entitled to clarify that Lombardi had already cooperated—effectively – with the investigation of others for the fraudulent scheme at Mutual Benefits. Livoti attacked Lombardi's credibility, and the government made a fair response to that attack.

Livoti's reliance on *United States v. Sorondo*, 845 F.2d 945 (11th Cir. 1988), is misplaced. In *Sorondo*, the government asked an investigator about his prior testimony that led to the conviction of over 100 defendants. We held that the district court plainly erred when it permitted this testimony because the jury "will unavoidably be tempted to accept the opinion of previous juries rather than exercise its own independent judgment." *Id.* at 949. But in *Sorondo*, the government asked the investigator about his prior testimony on direct examination,

28

and Sorondo had not attacked the investigator's credibility with his history of cooperation. *See id.*

In contrast, Livoti—not the government—first asked Lombardi about the result of his cooperation with the government, and Livoti then used that cooperation to attack Lombardi's credibility. And unlike *Sorondo*, where there was a danger the jury would merely credit the investigator's testimony, Livoti already introduced that danger into his trial when he told the jury that others had been held accountable for the fraudulent scheme at Mutual Benefits in prior proceedings. In his opening statement, Livoti's counsel told the jury about Steiner's guilt. The rule against bolstering does not tie the government's hands from responding to an attack on its witness's credibility. The government properly countered Livoti's attack on Lombardi's credibility with a fair response.

## E.  The District Court Did Not Abuse Its Discretion when It Denied Livoti's Motion for a New Trial Based on Juror Misconduct Without an Evidentiary Hearing.

After Livoti's trial, Juror J.D. discovered that he had mistakenly responded to a jury summons meant for his father, who shared the same name and address as Juror J.D. Livoti moved for a new trial because of juror misconduct, but the district court denied Livoti's motion without an evidentiary hearing. We review the denial of a motion for a new trial for abuse of discretion. *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc).

29

To justify an evidentiary hearing for a motion for a new trial, "the defendant must do more than speculate." *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990). If a defendant alleges a new trial is warranted because of juror misconduct, he must present "clear, strong, substantial[,] and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *Id.* (citation and quotation marks omitted) (alteration adopted).

Livoti argues that an evidentiary hearing was necessary to delve into Juror J.D.'s misconduct, but we find no misconduct occurred. Livoti alleges that Juror J.D. purposefully lied to take his father's place on the jury, but he "do[es no] more than speculate." *Id.* Livoti has not satisfied his burden because he failed to present "clear, strong, substantial[,] and incontrovertible evidence" of misconduct. Indeed, Livoti failed to explain why the district court erred when it concluded that there was no "indication that this incident was anything other than an honest mistake on [Juror] J.D.'s part." The district court did not abuse its discretion when it denied Livoti's motion for a new trial because no juror misconduct occurred.

### III. CONCLUSION

We **AFFIRM** Livoti's convictions.

30